(No. 34321.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EZRA MACK, Plaintiff in Error.

*Opinion filed September 20, 1957—Rehearing denied Nov. 19, 1957.*

152

MYER H. GLADSTONE, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and
BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago,

154

(FRED G. LEACH, BRUCE E. KAUFMAN, L. LOUIS KARTON, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

An information filed in the municipal court of Chicago charged Ezra Mack with the unlawful possession of heroin, a narcotic drug, in violation of the Criminal Code. (Ill. Rev. Stat. 1955, chap. 38, par. 192.2.) He pleaded not guilty, waived a trial by jury, was tried by the court and found guilty, then sentenced to the House of Correction for the city of Chicago for a term of five years. He has sued out a writ of error from this court and, although a misdemeanor only is involved, (See: Ill. Rev. Stat. 1955, chap. 38, par. 780½,) we entertain jurisdiction since defendant's claim that it was error not to require the prosecution to disclose the identity of an informer gives rise to a question of whether defendant was afforded the fundamental fairness essential in a criminal trial to the concept of justice embodied in constitutional guarantees of due process of law. *Roviaro* v. *United States,* 353 U.S. 53, 1 L. ed. 2d 639; see also: *Lisenba* v. *California,* 314 U.S. 219, 86 L. ed. 166.

From the testimony of George T. Sims, a Chicago police officer assigned to the narcotics bureau, it appears that the investigation which led to defendant's arrest began on March 13, 1956, when he was first observed in a tavern, then seen to enter an apartment building at 4633 Drexel Boulevard. The officer stated he followed defendant into the structure but lost him on the second floor level and did not see him leave the building that day. On March 20, 1956, an informer, who signed the admittedly fictitious name of "John Jones," made a complaint for a search warrant in which he stated under oath his belief that heroin and other contraband narcotic substances were kept and concealed by some person unknown in the second floor apartment numbered 2F at 4633 Drexel Boulevard. As a

basis for such belief the informer further stated: "I, John Jones, on the date aforesaid, saw in the aforesaid premises in the possession of some person unknown a quantity of narcotic drugs known as heroin from which said person sold and delivered to me one-half of an ounce of heroin for the sum of $80.00." Sims, who testified that the informer had come forward with his information voluntarily, accompanied him to the municipal court where two judges examined the complaint, questioned the complainant-informer and, on March 21, 1956, ordered a search warrant to issue as prayed.

With the warrant in their possession, officer Sims and his partner, officer James Bryson, established a watch over the building in question and saw no activity during the evening hours of March 21 other than defendant's entry by a side door. Nothing further occurred until the early minutes of March 22 when the officers saw a light in apartment 2F and noticed an automobile which parked in an alleyway at the rear of the building. Sims testified that both the owner of the car and the license number were known to the police and that a man drove the car away at a high rate of speed as he and Bryson approached to investigate. The officers pursued in their own vehicle and, after overtaking the car, had a conversation with the driver which culminated in his arrest and detention in the narcotics bureau. Thereafter Sims and Bryson returned to their positions outside the apartment building and, at approximately 1:30 A.M., saw the defendant leave apartment 2F by a rear door, descend to the ground by a fire escape, then walk toward Drexel Boulevard. Sims, who followed, saw defendant enter a car and drive away.

Immediately after defendant's departure the officers walked up to apartment 2F and, upon receiving no response to their knock, broke a window in the door and entered. The apartment showed no signs that it was used as a habitation but the officers found 2.2 pounds of white powder

stored in cans, bottles and glassine bags, a powder sifter, quantities of manite, (described by Sims as a laxative powder commonly used to dilute narcotics,) a pair of rubber gloves, empty glassine bags and paper sacks, two suitcases and one mink coat. When a field test of the white powder showed it to be a derivative of opium, the officer seized the articles found, noted them on the return of the search warrant, and subsequently turned them over to the police laboratory.

Sims and Bryson remained in the apartment the balance of the night then communicated with their office the following morning. Pursuant to that communication they went to a liquor store where defendant was employed and "arrested him in connection with the narcotics found in the apartment." A search of defendant's person produced a loaded revolver and a rent receipt showing that, on March 19, 1956, he had paid $70 rent on apartment 2F at 4633 Drexel Boulevard for the period of March 2 to April 2, 1956. Defendant first denied but then admitted he rented the apartment and stated he could not remember the last time he was there. When told that a large amount of narcotics had been found there and when asked if he knew about it, Sims' version of defendant's reply was as follows: "You going to put me in jail for that? Listen, I don't know anything about narcotics. Can't we do something about this? Can I call somebody? Can't you come back and get me later, something like that?" It further appears defendant was taken to the apartment and, according to Sims, he reacted as follows when shown the articles seized: "Is there something we can do about this? I don't know how it got here but I sure don't want to go to jail for all this stuff." Thereafter Sims signed the information against defendant which resulted in the conviction now under review.

Defendant filed a motion to quash the search warrant and to suppress from evidence the articles seized under its

authority but such motion was denied after a pretrial hearing. During the course of the hearing, officer Sims, who appeared as a witness for the People, refused to divulge the true identity of "John Jones" stating the latter's life would be in jeopardy if he did so. After the court heard the testimony of both sides and the arguments of counsel it, in effect, upheld Sims' refusal by denying the motion to quash and suppress. Defendant, relying upon a recent decision of the United States Supreme Court which holds that the identity of an informer must be revealed where fundamental fairness requires it, (*Roviaro* v. *United States,* 353 U.S. 53, 1 L. ed. 2d 639,) now insists the court committed an error in this case which infringed upon his constitutional right to meet and compel the attendance of witnesses, and upon his right to due process of law. Inasmuch as the propriety of Sims' refusal and the court's action may depend upon the relevancy of the informer's testimony to the accused's defense, we shall first consider defendant's contention that the evidence failed to prove beyond a reasonable doubt that he possessed heroin as charged in the information.

To sustain its burden of proof the People introduced the testimony of officer Sims who told of the events, already detailed, relating to the raid on apartment 2F and defendant's arrest. The narcotics and narcotics paraphernalia seized in the apartment were admitted in evidence along with the rent receipt found on defendant's person, and it was stipulated that tests conducted by a police chemist showed the 2.2 pounds of white powder to be heroin. Cross-examination of Sims brought out that two other men had been seen to enter the apartment while it was under surveillance, one of whom was Nolen Mack, defendant's brother, and the other an unknown person.

The defendant, testifying in his own behalf, stated that he was the manager of a liquor store at a salary of $60 per week, and that he lived at 4726 Drexel Boulevard with

his brother Nolen, having resided there since January, 1956. He admitted renting the apartment at 4633 Drexel Boulevard but denied having lived there or having been there during the periods testified to by Sims. While his counsel stipulated that the white powder found in the apartment was heroin, defendant disclaimed any knowledge of its ownership or presence there. He explained that he had come to Chicago from Memphis, Tennessee, in January, 1956, and had rented apartment 2F for his wife and children who were to follow him; that his wife came to Chicago near the end of February and remained until a few days after March 5, the date on which defendant said he last paid rent for apartment 2F; that she stayed with him at Nolen Mack's residence during her visit; and that she did not approve of apartment 2F because it did not have sufficient bedrooms. This testimony coincided for the most part with an explanation defendant had made to officer Sims at the time of his arrest, except Sims added that defendant had represented he was in the process of decorating the apartment to make it livable. Defendant further testified that he had decided to give up the apartment at the time of his wife's departure, that he left the single key he had been given on a table in the apartment, that he could not find the janitor to inform him of the key, and that he asked Mary Bowen, a tenant in the building, to tell the janitor that he had given up the apartment. He stated on cross-examination that he knew of no other keys to the apartment, though he presumed the janitor had one, that he had not given his key to any person, and that no persons other than himself had access to the premises.

With respect to keys, it appears that Sims took several from defendant at the time of the arrest and it was his recollection that he returned them the same day. While defendant was testifying he produced certain keys, stipulated by the People as being keys for the liquor store, and stated they were the same and only keys he had in his

possession at the time of his arrest. Although defendant's counsel sees in such testimony support for the theory that defendant had surrendered both the key and possession of apartment 2F on March 22, the circumstances under which the keys were preserved for evidence attaches doubt to their probative value.

Concluding his testimony, defendant repeated his denial of ownership or knowledge of any of the articles found in the apartment, denied that he ever used or sold narcotics, and stated that he had never been arrested or charged with any offense involving narcotics.

Mary Bowen, the only other witness for the defense, related that she lived in apartment 3G at 4633 Drexel Boulevard, that she knew defendant and was employed at the liquor store where he worked, that she had heard defendant express his intention of giving up his apartment, and that she did not know who had resided in apartment 2F during the months of February and March.

In *State* v. *Nicolosi*, 228 La. 65, 81 So.2d 771, 773, the court held: "Possession without knowledge of such possession is not possession in the legal sense of that word. * * * Knowledge is therefore an essential ingredient of the crime of possession of narcotics." Based upon this and similar expressions found in *People* v. *Savage*, 128 Cal. A.2d 123, 274 P.2d 905, and *People* v. *Antista*, 129 Cal. A.2d 47, 276 P.2d 177, defendant asserts his guilt was not proved beyond a reasonable doubt because proof of his knowledge that heroin was in apartment 2F is totally lacking. While we find no parallel in the decisions of this court, the authorities relied upon, together with *People* v. *Gory*, 28 Cal.2d 450, 170 P.2d 433, and *People* v. *Bledsoe*, 75 Cal. A.2d 862, 171 P.2d 950, reflect the majority view in narcotics cases that the prosecution may meet its burden of proving the knowledge essential to a conviction for possession by evidence of acts, declarations or conduct of the accused from which the inference may be fairly drawn that

he knew of the existence of the narcotics at the place they were found. (See also: *Commonwealth* v. *Gorodetsky,* 178 Pa. Super. 467, 115 A.2d 760; *People* v. *Tabb,* 137 Cal. A.2d 167, 289 P.2d 858.) Such a factual determination is, of course, a question for the jury, or for the court where a jury is waived. 72 C.J.S., Poisons, sec. 7c; 23 C.J.S., Criminal Law, sec. 1125.

When the view of the majority is applied to the case at hand it is our judgment that there is ample and satisfactory evidence from which to fairly infer defendant's knowledge of the narcotics he is charged to have possessed. The same evidence we feel, when tested for veracity, rebuts the contention that defendant had abandoned apartment 2F on the date narcotics were found there. The strongest inferences of defendant's knowledge arise from his conduct just prior to the time of the raid on the apartment he admitted leasing. He was observed entering the building during the evening hours of March 21, then, shortly after midnight, was seen to leave apartment 2F, which had been lighted, by a rear door. Thereafter he took the unusual course of descending a rear fire escape to reach his car parked in front of the building. Minutes later the officers entered the apartment and found the heroin there. In view of the fact the place was not used as a habitation and that it contained but little other than the narcotics and narcotics paraphernalia, it is a fair inference that defendant, who had just departed knew of its presence there. Such an inference is greatly strengthened by other circumstances reflected in the record. First of all there is the testimony of the defendant himself that he had not given the key of the apartment to anyone and that no person other than himself had access to the premises. Secondly, the rent receipt, which bears the date of March 19, 1956, three days before the narcotics were found in the apartment, discredits defendant's story that he had given up his tenancy shortly after March 5. Apart from the fact defend-

ant was seen leaving apartment 2F on March 22, 1956, we believe it an extremely remote possibility that one employed for $60 a week would pay an additional rental of $70, especially after already having paid two months rent without living in the apartment, at a time after he had purportedly acquiesced in his wife's decision that it was too small for their family needs. Also weakening his theory of abandonment is defendant's statement to Sims, at the time of his arrest, that he was in the process of redecorating to make the apartment livable. While not conclusive, we think, too, his testimony that he quit the premises with no notification other than to leave the key on a table, is also subject to doubt. Finally, the prosecution argues, and we feel with some justification, that defendant's statements at the time of his arrest are more compatible with knowledge than with injured innocence.

When the unsatisfactory nature of the evidence by which the defendant seeks to dissociate himself from apartment 2F on March 22 is considered in its entirety and weighed with relation to the circumstances that he paid rent on the apartment three days before March 22, and that he was observed leaving it minutes before the heroin was found, we are satisfied his knowledge of its presence may be fairly inferred.

Drawing upon decisions which require the element of exclusive personal possession to be proved on a charge of receiving stolen goods, (*People* v. *Kubulis,* 298 Ill. 523; *Conkwright* v. *People,* 35 Ill. 204,) defendant next contends the evidence fails to establish his exclusive personal possession of the heroin beyond a reasonable doubt. He says this is so largely because of Sims' testimony that Nolen Mack and an unidentified man were seen to enter the apartment, and because of his own testimony that he presumed the janitor had a key. Here again we have neither been referred to, nor have we found, a specific decision in this jurisdiction treating upon the proof needed to convict

under a charge of illegally possessing narcotics. However, based upon an analysis of numerous cases, we find it stated in 72 C.J.S., Poisons, sec. 8c, that "possession may be constructive, as well as actual." To this effect it is commented in both *People* v. *Henderson*, 121 Cal. A.2d 816, 264 P.2d 225, and *People* v. *Sinclair*, 129 Cal. A.2d 320, 19 P.2d 23, that the keeping of narcotics in a place under the immediate and exclusive control of the accused is possession under a criminal statute. While it is true in this case that others were seen to enter apartment 2F and the possibility exists that the janitor might have had a key, the evidence shows that it was defendant who paid the rent, that it was he alone who was seen to enter the apartment on the night of the raid, and that he alone left the apartment immediately before the narcotics were found. These circumstances, together with defendant's testimony under oath that he had not given his key to anyone and that no other persons had access to the premises, tend to show immediate and exclusive control of the apartment in the defendant. While much depends upon whether the testimony of Sims and the recitals of the rent receipt, or the explanations and denials of the defendant, are to be accepted as the truth, we are of the opinion there is sufficient evidence to show that defendant had the immediate and exclusive control of the premises where the narcotics were kept. Cf. *People* v. *Tabb*, 137 Cal. A.2d 167, 289 P.2d 858.

Because Sims, at one stage of his testimony, described the man who left apartment 2F by the rear door only as "a man about six feet tall, about two hundred twenty-five or thirty pounds," it is urged there is doubt as to whether the man might not have been Nolen Mack who was described by defendant as being six feet tall and weighing about one hundred sixty-five pounds. Such argument, however, loses its vitality in view of defendant's admission that he is six feet tall and weighs two hundred and twenty pounds, and in the face of further testimony by Sims wherein he stated

unequivocally that defendant was the person who left by the rear door immediately before the apartment was entered and the heroin found. Defendant suggests too that it was only Nolen Mack's fingerprints that were found in the apartment. No fingerprint evidence was introduced by the prosecution but questions relating to them were raised by the defense while cross-examining Sims, and we find nothing in his testimony, or in pretrial statements of officer Bryson which are alluded to, to justify a conclusion that the prints of Nolen Mack were the sole prints found other than those of police officers. In considering this argument it is significant too that a pair of rubber gloves was found with the narcotics paraphernalia seized.

Looking to the record in its entirety in the light of our function on review of determining only the question of whether there is sufficient credible evidence to prove an accused's guilt beyond a reasonable doubt, (*People* v. *Moretti,* 6 Ill.2d 494; *People* v. *McClain,* 410 Ill. 280,) we find no merit to defendant's present contention. The trial court, whose function it was, in the absence of a jury, to determine the credibility of the witnesses and the weight to be afforded their testimony, has rejected the explanations by which defendant attempted to place himself beyond knowledge and possession of the narcotic drugs referred to in the information, and has accepted the prosecution's evidence as true. From our analysis of the record it is our opinion there is ample evidence, both credible and legally sufficient, to establish defendant's guilt beyond a reasonable doubt, and we find nothing to justify our interference with the judgment based thereon.

Next to be considered are the issues created by the refusal of officer Sims to disclose the identity of the informer who signed the complaint for the search warrant that provided the authority for the seizure of vital evidence against defendant. The latter does not here contend that the fictitious signature rendered the warrant void, (see:

*United States* v. *McKay,* 2 F.2d 257, holding that a fictitious name signed to the affidavit is no ground for quashing the search warrant,) nor does he deny that the allegations of the informer's complaint and affidavit afforded probable cause for the issuance of the warrant. (See: *People* v. *Dolgin,* 415 Ill. 434.) He asserts, rather, that the privilege of non-disclosure did not exist in this case, that the prosecution's refusal denied him due process of law, and that he was denied his constitutional right to meet the witnesses against him face to face and to have process to compel the attendance of witnesses in his behalf. (See: Constitution of 1870, art. II, sec. 9.) It is apparent that the constitutional rights claimed must stand or fall on the determination of whether the privilege of refusing to divulge the name of the informer could be properly exercised in this case.

In meeting this issue we are benefited by the recent case of *Roviaro* v. *United States,* 353 U.S. 53, 1 L. ed. 2d 639, wherein the court, after reappraising former decisions, reiterated its recognition of the government's privilege, commonly called the "informer's privilege," to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with the enforcement of that law. The court said: "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." (353 U.S. at 59, 1 L. ed. 2d at 644.) Extensive research has brought to light no case in which the privilege has been upheld to conceal the identity of one signing an affidavit for a search warrant; however, we infer its application in such a case from numerous decisions which have dealt with the scope of the informer's privilege where the legality of a search *without* a warrant was in issue and the communications of an informer were

claimed to establish probable cause. (*Scher* v. *United States,* 305 U.S. 251, 83 L. ed. 151; *United States* v. *Li Fat Tong,* 152 F.2d 650; *Wilson* v. *United States,* 59 F.2d 390; *United States* v. *McKeown,* 19 F. Supp. 639.) The rationale of the latter cases is that the identity of the informer must be disclosed unless there is sufficient evidence apart from his confidential communication.

The *Roviaro case* also pointed out that the privilege is not absolute and added to the already established exceptions those cases where disclosure is required by fundamental fairness, *e.g.,* where the disclosure of the identity is relevant and helpful to the defense of the accused, or is essential to a fair determination of the cause. Accordingly, since the informer against Roviaro had helped set up the commission of the crime, (*viz.,* that the accused did "fraudulently and knowingly receive, conceal, buy and facilitate the transportation \* \* \* of \* \* \* heroin, knowing the same to be imported into the United States contrary to law ;") and because he had been present at its occurrence, the court concluded that nondisclosure was manifestly unfair, pointing out that the informer was in fact a participant in the crime and that conversations with Roviaro, (heard by a concealed police officer,) which only the informer could amplify or contradict, had been used as evidence to secure the conviction.

Although the defendant urges the result of the *Roviaro case* upon us, similar circumstances do not prevail in this case. Here officer Sims stated without contradiction that the informer took no part in serving the search warrant or in defendant's arrest; the record is barren of any showing or inference that he either participated in the crime of the defendant or helped set up its commission; and no part of his communication to the police or conversations with defendant, if any he had, were used as evidence in the cause. Nor does it appear, from the theory of total denial that was pursued, that the testimony of the informer would

be relevant or helpful to the defense. The information charges defendant with the unlawful possession of heroin on March 22, 1956. Thus the informer's testimony regarding who he saw or what he heard in apartment 2F on March 18, 1956, would be of little help or relevancy to the defense against a charge that defendant illegally possessed heroin four days later. That this is so would seem to be borne out by the showing of the record that it was only during the hearing on the motion to quash the search warrant that defendant made any demand for the informer to be identified, and then only for the stated purpose of determining if his statements in the complaint for the search warrant would withstand a charge of perjury. Aside from the fact that the attack on the search warrant is not pursued in this court, it would appear that any charge of perjury was sufficiently answered by the results of the raid on the apartment named in the informer's complaint. In any event, there is no showing that the defendant was unfairly deprived of presenting any element of his defense during the course of his trial.

In short, it is our opinion that, regardless of what the informer's testimony might have been, it would have little relevancy in face of the independent evidence by which the crime of March 22 was proved. Under such a circumstance, together with the facts which show that the informer neither participated in the crime nor was present at the time of the raid or arrest, amplification or contradiction of the information which caused the defendant to be placed under surveillance and caught in the commission of his crime would be of no assistance to his defense. We therefore see no unfairness to defendant, or any basis for upsetting the public purpose upon which the informer's privilege is said to rest. As we construe the facts, the case falls within the principle of *United States* v. *Scher,* 305 U.S. 251, 83 L. ed. 151, wherein it was held the identity of an informer, whose information provoked police investigation

and the arrest and search of the accused's car without a warrant, could remain undisclosed when the police subsequently saw and heard for themselves sufficient to justify conviction. The circumstance of the present case that the informer conveyed his information to the police through the medium of a search warrant does not, as we view it, afford a reason to depart from the principle of the *Scher case*. We conclude that the informer's privilege was fairly and properly exercised in this case and that its exercise does not imply, as defendant suggests, that the informer's testimony would have been unfavorable to the prosecution.

As a concluding assignment of error defendant urges he was prejudiced by statements of officer Sims and an assistant State's Attorney, made during the course of the hearing on the motion to quash, to the effect that the informer's life would be in danger if his identity was revealed. While it is true suggestive statements of a similar nature have in some instances been held to constitute reversible error when made in the presence of a jury, (*People v. Herbert*, 361 Ill. 64; *People v. Fiorita*, 339 Ill. 78,) there was no jury in this case and, unless the contrary is clearly manifest, it is to be presumed that the court eliminated prejudicial remarks from his mind and considered only proper evidence. Moreover, we may consider the court's awareness that the personal safety of an informer is one of the public purposes for preserving his anonymity, and it is likewise reasonable to assume the court shared in the common knowledge of the fate that sometimes befalls informers. We therefore consider it exceedingly doubtful that the fears of retaliation expressed by the prosecution created the bias and prejudice now claimed.

It is our opinion defendant's trial did not lack fundamental fairness and that the judgment of the municipal court of Chicago was correct. Accordingly, that judgment is affirmed.

*Judgment affirmed.*