The People of the State of Illinois, Plaintiff-Appellee,
v. Kay Jarrett, Defendant-Appellant.

Gen. No. 49,599.

First District, First Division.
March 15, 1965.
Rehearing denied April 1, 1965.

Bellows, Bellows & Magidson, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Kenneth L. Gillis, Assistant State's Attorneys, of Counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

Defendant, Kay Jarrett, by informations filed in the Municipal Court of Chicago, (prior to the effective date of the Judicial Article) was charged with the offenses of soliciting for prostitution (Ill Rev Stats 1963, c 38, § 11–15(2)), and pandering (Ill Rev Stats 1963, c 38, § 11–16(2)). She was found guilty in a trial before the court on both charges and sentenced to the county jail for a term of ninety days in each case, the sentences to run concurrently.

Defendant appeals contending ,the trial court committed reversible error in admitting in evidence, as proof of the guilt of the defendant, the statement of witness, Sandra Silver, and in refusing to permit the defendant to cross-examine a police officer concerning a person who was present on an occasion involved in the offenses charged. Defendant further argues that the crime of pandering, the punishment for which may be imprisonment in the penitentiary, was not within the jurisdiction of the Municipal Court prior to the effective date of the Judicial Article, and prosecution could not be commenced by an information without a waiver by defendant.

A review of the evidence and conduct of the proceedings is necessary to pass upon the contention that reversible error was committed in the trial.

Thompson Phelps, a Chicago police officer, assigned to the prostitution unit, testified that he, in the company of another man, saw defendant at her apartment on September 10, 1963, at 7:45 p. m.; that he told

171

her he was a representative of a company and as such had many rich clients; that if she could get nice looking young girls who could take care of these men sexually he could secure contacts. Defendant replied that she could help and stated that the girls she had were nice looking well dressed young girls. When he asked how much it would cost him she said "$25 for me and $50 for each girl." He agreed and told her he wanted the girls for Thursday evening, September 12 at about 8:00 or 8:30 o'clock; that he would give her a "ring" and let her know; and that defendant had warned him not to mention sex because her phone may be tapped by the police department.

On Thursday, the 12th, he called her and said he would be over shortly "to take her out to dinner" to which she agreed. He arrived at her apartment alone about 7:45 p. m., asked where the girls were and she said they were coming right over. He informed her that he had the men waiting for him at a certain motel and gave her the room numbers; that he wanted to make sure that these girls would "french" and that his clients would be "taken care of." She asked him if he was trying to "needle" her. Officer Phelps testified further that his clients expected the girls to indulge as he indicated and he did not think the clients would accept them. The deal was off. "Well," she said, "I have got these two girls. I don't have any money to pay them, pay their cab fare, leave me $10 and why don't you let the fellows see the girls and let them decide what they want to do." He said he would see if his clients would "take them" under that condition.

He called her at 8:30 from the "hotel" room (two other officers were with him at the time) and said, "I have the men; are the girls there for the sex party?" She answered yes and he stated that he would be right over. He arrived at her apartment at 8:45 or 9:00 p. m.

172

She told him that she had warned him about using the telephone. She requested his identification and after he showed it to her she said she didn't know he was from Texas. He took out $40 and said, "Here is the rest of the $50 for the girls, let me see the girls." She accepted the money and went "in" the back and came out with Sandra Silver and Ann Walker. Sandra said, "Why Detective Phelps of the Chicago Police Department." He denied being Phelps to which Sandra replied that she knew he was. Defendant then said, "Don't you fellows ever give up trying to get me?" She "tried to get" him to admit that the girls weren't going to go out for prostitution. Defendant and the girls were arrested and taken to police headquarters.

During the cross-examination of Phelps, counsel for defendant attempted to elicit from him the name of the man who accompanied him on the first visit. Objection was made by the state "on the ground of informer's privilege" which objection the court sustained. Defense counsel then queried whether the "other man" did not represent himself as a man from a well recognized detective agency * and objection to the question was again sustained. Phelps did say that the man introduced himself as a supervisor of that detective agency.

Sandra Silver was called as a witness by the prosecution. When she refused to testify on the grounds that her answers might incriminate her, the state produced an immunity petition and the court entered an order of immunity and dismissal of all charges against her. Sandra testified that she knew the defendant Kay Jarrett approximately six months; that she was employed by her, and a few days prior to the 12th had a conversation with her regarding this employment.

---

* Justice and fairness require we not mention the name of the agency as it is in no way involved in the proceedings.

Defendant knew she (Sandra) was going back to school and making very little money. Sandra was aware that defendant ran an escort service which subject came up during the conversation. Defendant said a gentleman would take her for dinner and she would "make something as a tip." The next time she saw her was on the 12th when defendant called her to come over and told her she talked to a man who mentioned something about sex and wanted more than a dinner date. About an hour and a half before the officers entered the apartment defendant told her she had called the "deal" off; that she refused to send "us"; and that she was never approached by the defendant to commit an act of prostitution.

The State claimed surprise as a result of this testimony informing the court that Sandra had previously given a written statement diametrically opposed to what she now testified. The State requested that she be called as a court's witness, subject to cross-examination, which request was granted over defendant's objection.

On cross-examination by the State she admitted making a written statement to the police on the night of September 12, in the presence of Phelps and police officer Halloran. Upon being shown this statement she said she answered most of the questions "even the answers, themselves, I definitely did give answers that coincided. But they have stuck some extra things in here." Upon the questions and answers of the statement being put to her she admitted saying that September 12 was the first night she worked for the defendant, Kay Jarrett; that she was approached by the defendant to commit acts of prostitution; that she would go into court and testify against her and tell all she knew about the prostitution operation defendant conducted; and that she signed the statement which recited that it was made of her own free will without

174

any promises being made to her. The State offered the document in evidence and it was admitted. When cross-examined by defendant's counsel she said the statement that Kay Jarrett approached her to commit acts of prostitution was false; that the statement was the result of strain, fear of arrest and publicity, police threats and promises; and a promise to be released without obtaining her own bail.

Officer J. Mildice, mentioned by Sandra as committing the threats and coercion, testified that officer Phelps brought her into his office at the police station because she wanted to talk to the boss, the commanding officer of the unit; that when she wanted to know what would happen if she gave a statement against Kay Jarrett, he told her that the state's attorney would be informed of this fact and decision would be up to him, and that was all he told her about giving a statement.

John Halloran, an officer in the unit, took the written statement from Sandra in the presence of Ann Walker, the defendant, and Thompson Phelps. The three women were sitting two or two and a half feet away from him at the time. Sandra did not seem to be upset and he made her no promises. Sergeant Mildice was in and about the office during the taking of the statement.

Defendant, in this appeal, does not dispute the sufficiency of the evidence but charges that errors of the trial judge require reversal. It therefore is not necessary that we detail the testimony given by the defendant in her own behalf, except to summarize insofar as it bears directly upon the matters in issue. She said she met officer Phelps on the "Sunday" night previous to her arrest. When her doorbell rang she said "Who is it? He said this is Red with ———— Detective Agency, can I come up, or do you remember me, can I come . . . . I pushed the buzzer and admitted him and this man was with him (indicating officer Phelps)." She

175

opened the door to her combination living room and office and this fellow, Red, who had in fact been with —— Detective Agency as a guard around conventions, and whom she had met, came in. She said she had been active around conventions a great deal then. She further said Red, highly intoxicated, fell on the floor and had to be assisted up to the davenport. Despite the fact he was "pretty" intoxicated, Red was "pretty" coherent; he did most of the talking. She related having a conversation with regard to providing "some company" for certain clients of theirs, to go to dinner and cabareting and to do the town; that although she was virtually out of business she would see what she could do to get someone; that when the remark was made "that if they wanted to get laid," she didn't want to hear any more about it; that Red then spoke up, "Kay only knows nice girls," and that when query was made about fees, Red "mouthed $50." She said her fee was $25 and the girls' fee depended on the number of hours they stayed. But there was nothing definite. They were to let her know Thursday.

Phelps, using the name Don Duncan, conversed with her on Thursday. Although he said that they were at the motel and wanted to get laid, she told him that she had a couple of girls "but let's forget it, just give me $10 to pay their cab fare" and he gave her the $10 and left. He later called, saying he talked to his clients and that they were willing to take just the dinner date and cabareting. He came to the house and said that he was going to give her $50 more, that was $25 apiece for the girls. Sandra walked in then and recognized Phelps as a policeman. The arrests followed.

Defendant contends that the prosecution should not have been permitted to call Sandra as a court's witness, because there was no showing that the State interviewed her or had been informed as to what she

176

would testify except that she had given a statement diametrically opposed to her testimony.

In People v. Williams, 22 Ill2d 498, 177 NE2d 100 (1961), a similar situation occurred. The witness there gave a signed statement to the police implicating the defendant in the crime. At the trial, she was called by the prosecution after receiving assurances of immunity. In the testimony she repudiated her written statement and absolved the defendant. The State claimed surprise as a result of this testimony and she was made a court's witness. The Supreme Court (p 503) said:

> Therefore, at the time of the trial the State knew that Jacqueline had originally accused the defendant, both verbally and in a written statement, that she later retracted this accusation at the preliminary hearing, but that her last testimony before the trial, which was given before the grand jury, did accuse the defendant of selling her narcotics. Under these circumstances we think that the State had the right to call her as a prosecution witness originally, and grant her immunity, since they could reasonably assume that her testimony at the trial would be the same as her testimony before the grand jury. When she retracted her accusation of the defendant at the trial, the State had the right to claim surprise and to request that she be called as court's witness. We are of the opinion that the action of the trial court in calling Jacqueline Hill as court's witness was within the court's discretion and was not error.

██ Defendant argues that there must be a finding by the court based upon sufficient proof that surprise actually existed and in the absence of any adequate showing of surprise, it was error to have Sandra

177

cross-examined by the prosecution concerning her prior statement. According to the Williams case the trial court, in its discretion, may make one a court's witness where the party calling such witness can reasonably assume that the testimony would be the same as the witness had given last, there being no evidence of any intended subterfuge by the party. In the case at bar, the charges were made by information and no preliminary hearing or grand jury proceedings were required. The witness Sandra was represented by counsel. She asserted her constitutional privilege against incrimination as a reason for refusal to testify when called by the State. Having previously given a written statement indicating it was made of her own free will, the State could reasonably assume that if she were granted immunity she would testify to facts as given by her in the written statement. We find there was no abuse of discretion in calling her as a court's witness.

 It is the contention of defendant that the statement of Sandra should not have been admitted in evidence and to do so was error. That proposition was also passed upon in the Williams case cited above. There, as in the case at bar, defendant contended "that since Jacqueline Hill admitted that she had made contradictory statements in a written statement, the State had no right to introduce the statement itself." The court, on page 504, stated:

> The better view would seem to be that a party is not foreclosed from making further proof of the former inconsistent statements even when the witness admits having made such statements, for the party may prefer to have these statements clearly brought out and emphasized. (3 Wigmore on Evidence, sec 1037; Hapke v. Brandon, 343 Ill App 524, 99 NE2d 636.)

Paraphrasing the Supreme Court in that case, we are of the opinion that the trial court properly admitted the written statement in evidence.

Defendant next contends that the trial court committed reversible error in restricting cross-examination of Phelps regarding the disclosure and identity of the man who accompanied him on the first visit to her apartment. She insists that his identity was of utmost importance in the preparation of her defense and, except for the defendant herself, was the one material witness who could have possibly refuted the testimony of Phelps concerning "this important conversation." She relies on Roviaro v. United States, 353 US 53 (1957) as authority that the identity of the informer should have been disclosed.

The informer's privilege is the privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with the enforcement of that law. People v. Mack, 12 Ill2d 151, 164, 145 NE2d 609 (1957). The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourage them to perform that obligation. Roviaro pointed out that the privilege is not absolute and that the identity of such informer must be disclosed whenever the informer's testimony may be relevant and helpful to the defense of the accused, or is essential to a fair determination of the cause. People v. Mack, 12 Ill2d 151, 165, 145 NE2d 609. In Roviaro, the court further said (p 62) :

> We believe no fixed rule with respect to disclosure is justifiable. The problem is one that

179

calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

Accordingly, since the informer against Roviaro had helped set up the commission of the crime (viz., that the accused did "fraudulently and knowingly receive, conceal, buy and facilitate the transportation . . . of . . . heroin, knowing the same to be imported into the United States contrary to law. . . .") and because he had been present at its occurrence, the court concluded that nondisclosure was manifestly unfair, pointing out that the informer was in fact a participant in the crime and that conversations with Roviaro (heard by a concealed police officer), which only the informer could amplify or contradict, had been used as evidence to secure the conviction.

In Sorrentino v. United States, 163 F2d 627 (1947), at pages 628, 629, the court said:

The objection was that the questions were improper because they sought disclosure of the identity of the person whom Grady called an informer. We agree with appellant that this was not a valid objection. If the person . . . called an informer had been an informer and nothing more, appellant would not have been entitled to have his identity disclosed; but the person . . . was something more. He was the person to whom appellant was said to have sold and dispensed the opium described in the indictment. Information as to this person's identity was therefore

180

material to appellant's defense and appellant was entitled to a disclosure thereof. Hence the court erred in sustaining the objection. However, we hold that the error was harmless, for the following reasons.

Although the identity . . . was not disclosed by Grady's testimony, it was disclosed by Lieberman's testimony. Lieberman's testimony showed that Berry was the person whom Grady called an informer; that Berry had a room at the Uptown Hotel . . . and was an employee of that hotel; and that Berry occupied the house at. . . . Hence, appellant was not prejudiced by the court's error.

And in Williams v. United States, 273 F2d 781 (1960), the court said that the rationale of the Roviaro case is that the government should identify the informer in order to insure that a defendant can have a full and fair chance to defend himself against the offenses charged by having knowledge of who the informer is. They held that the government in that case was faithful to the rationale when its officers gave the name of the informer and he was personally known to at least one of the defendants. The court commented on the fact that defendant there made no effort to subpoena the named person; that his existence and reliability were undisputed and that the information furnished by him formed only a part of the "probable cause" upon which the officers acted at the time of making the arrest.

■ The facts in the case before us clearly establish that defendant had a personal acquaintanceship with the informer prior to the offenses charged herein. Through her cross-examination of officer Phelps it was first brought out that the informer was called "Red" and was employed by the well known detective agency. Although the defendant was arrested on September

181

12, 1963, and went to trial on December 20, 1963, no effort was made by her to discover any further information regarding "Red" or his whereabouts nor did she attempt to subpoena him. There is no indication of prejudice or disadvantage suffered by the defendant but the general charge that "Red" could have possibly refuted the testimony of Phelps concerning the conversation first had with her. We are of the opinion no reversible error was committed in sustaining the State's refusal to disclose any further identity of the informer.

■■ We further find that regardless of what the informer's testimony might have been, it would have little relevancy in the face of the independent evidence of the incidents of September 12 by which the offenses were proved. Looking at the record in its entirety in the light of determining only the question of whether there is sufficient credible evidence to prove an accused's guilt beyond a reasonable doubt, we find no reason to reverse the guilty findings by the trial court.

Finally, defendant contends that the offense of pandering can only be prosecuted by indictment and not by information as it was in the instant case; that the Municipal Court, having limited criminal jurisdiction was without authority to try the charge, and its judgment and conviction is void, and without force or effect.

Article 2, section 8 of the Illinois Constitution provides:

> No person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which punishment is by fine, or imprisonment otherwise than in the penitentiary, . . .

Section 11–16(b) of the Criminal Code of Illinois (Ill Rev Stats 1963, c 38, § 11–16(b)) provides:

. . . A person convicted of pandering other than by compulsion shall be imprisoned in a penal institution other than the penitentiary not to exceed one year, or in the penitentiary from one to 5 years.

Section 2 of An Act in Relation to a Municipal Court in the City of Chicago (Ill Rev Stats 1963, c 37, § 357) provided at the time this action was commenced:

Third. Criminal cases. Cases to be designated and hereinafter referred to as cases of the third class, which shall include all criminal cases in which the punishment is by fine or imprisonment otherwise than in the penitentiary; all other cases which the laws in force from time to time may permit to be prosecuted otherwise than on indictment by a grand jury, and all criminal cases of whatever nature which may be transferred to it by change of venue or otherwise by any other court of competent jurisdiction.

The above section was the only authority by which criminal jurisdiction was conferred upon the Municipal Court of Chicago. Therefore, if the crime of pandering could only be prosecuted on indictment by a grand jury, the Municipal Court could not pass sentence in this cause regarding the charge of pandering.

In People v. Glowacki, 236 Ill 612, 86 NE 368 (1908) an information was filed in the Municipal Court of Chicago charging the defendant with adultery. He was found guilty and sentenced to pay a fine of $400 and costs and to stand committed until such fine and costs were paid. The penalty for the crime of adultery was a fine not exceeding $500, or confinement in the County

Jail not exceeding one year. The sole question on appeal was that defendant could only be tried on the offense charged, upon an indictment by a grand jury under section 8 of article 2 of the constitution. On appeal the defendant there contended that section 8 of article 2 meant that only such offenses as may be punished by fine *only* or by imprisonment (otherwise than in the penitentiary) *only* could be prosecuted upon information, and that an offense which may be punished in the alternative, *either* by fine *or* imprisonment, otherwise than in the penitentiary, could not be prosecuted upon information. The court held that this was not the meaning of that constitutional provision and said (p 616):

A decision of this question requires only a construction of the constitution, as, plainly, under the provision of the Municipal Court act (either as originally passed or as amended in 1907) the legislature intended to give to that court full power to try upon information all criminal offenses that under said section 8 of article 2 of the constitution could be tried without an indictment by the grand jury, the wording of both paragraph 3 of section 2 and paragraph 27 as above quoted, giving jurisdiction to that court to try on information without indictment, being in the identical language of said constitutional provision authorizing trial on information. *The words of the constitution granting this power, namely, "in cases in which the punishment is by fine, or imprisonment otherwise than in the penitentiary" were intended, we think, to base the distinction between cases that could be tried on information and those which could only be tried on indictment of a grand jury, upon the fact as to whether they were punishable by imprisonment in the penitentiary or whether the punishment was by*

*imprisonment otherwise than in the penitentiary, or by fine, or both.* (Emphasis ours.)

On page 618 of the opinion, the court said: "Again in Paulsen v. People, 195 Ill 507, we stated (p 516): 'Grand juries have not been abolished, and consequently no person can be held in this State to answer for a criminal offense which may be punished by imprisonment in the penitentiary, except upon the indictment of a grand jury. . . . Said section 8 of article 2 of the constitution permits the prosecution, otherwise than by indictment, of all violations of the criminal laws which involve *only* punishment by fine or imprisonment in the common jail'." (Emphasis ours.)

In People v. Boykin, 298 Ill 11, 131 NE 133 (1921), an information was filed in the Municipal Court of Chicago charging defendant with the offense of pandering. Upon conviction, he appealed charging the Municipal Court was without jurisdiction in violation of section 8, article 2 of the constitution. The court, on page 21, of its opinion said: "The municipal court had jurisdiction of this offense. That court is a court of limited jurisdiction, but it has jurisdiction of offenses committed within the boundaries of the city which are prosecuted by information and punishable by fine and imprisonment otherwise than in the penitentiary, and this is not questioned by plaintiff in error. His contention is, that under the information in question he might have been convicted of a second offense if the proof had shown that he had been previously convicted of pandering. We cannot accede to this contention. Every fact necessary to sustain a sentence imposed by a court in a criminal case must be alleged in the information or in the indictment, and an indictment under which it is sought to impose a higher penalty by reason of a previous conviction must allege the fact of such conviction. . . . *It is true that if the*

185

*information had properly alleged a conviction of a former offense of pandering the municipal court would not have had jurisdiction, as the prosecution would have had to be by an indictment and tried in a court of record having jurisdiction to impose the penalty of imprisonment in the penitentiary."* (Emphasis ours.)

Following the Glowacki case, our Supreme Court had occasion to consider the same constitutional provision in People v. Russell, 245 Ill 268, 91 NE 1075 (1910). There defendant was convicted in Municipal Court of Chicago on an information which charged her with petit larceny and was sentenced to four months imprisonment in the House of Correction and to pay a fine of one dollar. She sought reversal and insisted petit larceny could not be prosecuted by information. The court cited section 8 of article 2 of the constitution and further stated that section 7 of division 2 of chapter 38 provided that every person convicted of crimes therein enumerated, specifically spelling out the crime of larceny, should be deemed infamous and were thereby forever thereafter rendered incapable of holding any office of honor, trust or profit, or voting at any election, or serving as a juror unless restored to these rights by a pardon. Therefore the court said it appeared that the smallest part of the punishment was the fine and imprisonment imposed by the judgment of the court because the judgment was followed by a loss of civil rights, which practically deprives the convict of his citizenship unless restored thereafter by a pardon. There remained to him after the judgment of court is satisfied only his mere personal rights by virtue of which his life, his liberty and his property are protected from deprivation. At page 273 the court stated: "The constitutional provision mentioned was under consideration in the case of People v. Glowacki, 236 Ill 612, and it was held there that all violations of law could be prosecuted by information where the

186

punishment was by fine alone, by imprisonment otherwise than in the penitentiary alone, or by either fine or such imprisonment or by both fine and such imprisonment. This enumeration includes all the cases in which prosecution may be carried on by information. Cases in which the punishment consists of fine and imprisonment and some additional penalty can be prosecuted only by indictment. (People v. Kipley, 171 Ill 44.) . . . Here, however, there is a deprivation of substantial civil rights as a penalty declared by law upon a conviction for crime, and it cannot be considered in any other light than as punishment for the crime. The deprivation of any civil right for past conduct is punishment for such conduct. Cummings v. Missouri, 4 Wall 277." And the court therein held that so long as larceny (without regard to the amount involved) subjected the offender to the disabilities which constituted a part of the punishment it could not be prosecuted otherwise than by indictment. They reversed the judgment on the ground that the offense of petit larceny could not be prosecuted by information so long as conviction therefor included the penalties of an infamous crime.

Since the Russell decision, it is provided by statute that larceny is an infamous crime if punishment for said larceny is imprisonment in the penitentiary. (Ill Rev Stats 1963, c 38, § 124–1).

People v. Harshbarger, 296 Ill App 397, 16 NE2d 247 (1938), involved prosecution for malfeasance in office by information. The statute provided that upon a conviction the punishment thereof "shall be fined not exceeding $10,000 and may be removed from his office, trust or employment." Upon a finding of guilty, as part of the judgment, the court provided that defendant be removed from office. On appeal, the defendant questioned the jurisdiction of the County

Court that entered the judgment. Citing People v. Russell, 245 Ill 268, 91 NE 1075, the court said (p 400):

It is there stated that where the deprivation of any civil right for past conduct is punishment for such conduct, that such is not a mere incident of the punishment, but part of the punishment itself, and that where there follows from the judgment, a loss of civil rights, the offense cannot be prosecuted by way of information, but only by indictment.

The court held that the terms of the statute under which the defendant was convicted, subjected the offender to punishment other than by fine or imprisonment otherwise than in the penitentiary and could be prosecuted only upon an indictment by a grand jury. ■■ The State cites numerous authorities to uphold its position that the trial court had jurisdiction of the offense of pandering on the information filed. None are applicable. The cases cited in the main were prosecutions by indictment and none were concerned with section 8 of article 2. They are cases where the reviewing court considered the distinction between felony and misdemeanor for the purpose of applying the statute of limitations; the question of appeal to the Appellate or Supreme Court; or whether several offenses could be charged in one indictment. The legislature may, at any time, change the definition of "felony" or, by effecting the punishment of an offense, change a felony to a misdemeanor. People v. Bilderback, 9 Ill2d 175, 137 NE2d 389 (1956). But the legislature cannot effect the constitutional guarantee of section 8 article 2 regarding the function of the grand jury except as therein specifically provided, "that the grand jury (may) be abolished by law in all cases."

■ Section 8 of article 2 of the constitution is not founded on whether an offense is a felony or a misdemeanor and these terms are not mentioned in it. Simply stated, it requires criminal offenses to be prosecuted by indictment by a grand jury. Where an offense is punishable by fine *alone* or imprisonment otherwise than in the penitentiary *only* or both fine and such imprisonment only, such offense may be prosecuted by information.

■ After a review of the authorities and application of the restriction contained in section 8 article 2 of the constitution of the State of Illinois, we find that the offense of pandering, where the punishment may be more than by imprisonment otherwise than in the penitentiary, or by fine, or both, can only be prosecuted on indictment by a grand jury. For the reasons given the pandering conviction is reversed. The judgment finding defendant guilty of soliciting for prostitution is affirmed.

Reversed in part, affirmed in part.

BURMAN, P. J. and MURPHY, J., concur.