(No. 71319.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee; v. TODD L. FRIEBERG, Appellant.

*Opinion filed March 12, 1992.*

328

HEIPLE, J., joined by BILANDIC, J., concurring in part and dissenting in part.

J. Steven Beckett, of Beckett & Crewel, of Champaign, and Rex L. Reu, of Thompson & Weintraub, of Bloomington, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Bradley P. Halloran, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of McLean County, defendant, Todd L. Frieberg, was convicted of one count of controlled substance trafficking and one count of possession of a controlled substance under the Illinois Controlled Substances Act. (Ill. Rev. Stat. 1987, ch. 56½, pars. 1401.1(a), 1402 (a)(2).) Defendant was assessed a fine of $50,000 and ·sentenced to concurrent terms of 30 years' imprisonment for the controlled substance trafficking offense and 15 years' imprisonment for the possession offense. Defendant was, however, acquitted of unlawful possession of a controlled substance with intent to deliver. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.) Defendant appealed the convictions and the appel-

late court affirmed. (202 Ill. App. 3d 1115 (unpublished order under Supreme Court Rule 23).) We subsequently granted defendant's petition for leave to appeal. 134 Ill. 2d R. 315.

Defendant contends that the jury verdict finding him guilty of controlled substance trafficking is legally inconsistent with a finding of not guilty of possession with intent to deliver a controlled substance. Defendant maintains that, on grounds of double jeopardy, his acquittal of the possessory offense requires acquittal of the trafficking offense. We are not persuaded that such is the case. Neither are we persuaded that, as defendant further contends, reversible trial errors occurred; the evidence was insufficient to support conviction; or the jury was improperly instructed. We therefore affirm the judgment of the appellate court for reasons which follow.

## FACTUAL BACKGROUND

The following general facts were adduced at trial. During the fall of 1988, defendant worked as bar manager at "Traditionz," a newly opened nightclub located in Bloomington, Illinois. At defendant's urgings, his parents and aunt had become investors in the nightclub which was also owned by Brad Maloney, the general manager. Defendant's parents invested because they believed it would prove beneficial to defendant by providing him financial independence. Throughout the fall, however, the new business experienced severe cash-flow problems. Maloney requested that defendant's parents invest additional funds in the business, but they declined.

In December 1988, defendant and his parents went to Florida for a vacation. While defendant was there, Maloney contacted him and asked that he join Maloney in Fort Myers, Florida, in an attempt to acquire additional investment capital from Mark Zwieg, a friend of Maloney. Defendant and Maloney met with Zwieg, who

expressed an interest in investing, but they did not obtain any investment monies from him. Defendant shortly returned to Bloomington.

Sometime in late December, Todd Hayes, another employee of Maloney, had several conversations with Maloney concerning the purchase of a kilo of cocaine. Unbeknown to Maloney, Hayes was working as an undercover agent for the Illinois State Police Division of Criminal Investigation (DCI). Maloney advised Hayes that he was thinking about taking a trip to Florida and would bring back a kilo of cocaine to sell to Hayes. They agreed upon a price of $38,500. Hayes and Maloney also agreed that if Maloney was successful in obtaining the cocaine, he was to call Hayes and refer to the cocaine as a "bottle of wine." The focus of the State's investigation was Maloney. Maloney made no mention of defendant to Hayes.

On January 1, 1989, Maloney called defendant and advised him that Zwieg was prepared to invest, but that they would need to travel immediately to Florida to obtain the money. Defendant tried to make air travel arrangements for Maloney alone. Defendant also tried unsuccessfully to interest Scott Scheidenheim and John Garcia, his roommates, in traveling by auto to Florida with both him and Maloney. That evening, defendant and Maloney left Bloomington for Florida, traveling in an auto rented by Maloney. The pair arrived in Fort Meyers and met with Zwieg. While Zwieg never made any final decision concerning investing, Maloney and defendant continued to stay at Zwieg's house.

On January 2, 1989, Maloney advised defendant that he knew a person named Eddie Seaz, from whom they could obtain some money. On January 4, Maloney told defendant that Seaz would "front" a kilo of cocaine which Maloney could sell in Bloomington to a particular individual. According to defendant, he told Maloney that

he thought that the plan was a bad idea, but Maloney gave assurances that he would carry out the plan alone. That evening, Maloney and defendant drove to the Seaz residence where Maloney met outside with Seaz. According to defendant, he was told by Maloney to go into Seaz's house and wait. While he was inside, defendant heard the sound of the spare tire and jack being removed from the trunk of the car which he and Maloney had driven. Maloney and defendant then drove to another location where Enrique Felix joined them. During the drive there, Maloney told defendant that Seaz had put the kilo of cocaine into the trunk of the car. Maloney also told defendant that Felix would travel with them on the return trip to Illinois to guard the kilo of cocaine and eventually collect a designated sum of money for it.

After Felix joined defendant and Maloney, they immediately traveled to Bloomington, arriving the next day around 6:30 p.m. They drove to defendant's apartment, where Maloney and Felix followed defendant inside. Scott Scheidenheim and John Garcia, defendant's roommates, were also present in the apartment. Defendant's apartment consisted of several levels. A kitchen, bathroom and several bedrooms were upstairs; and defendant's bedroom, a bathroom, and the living room area were in the lower, basement level.

Once inside the apartment, defendant went to his bedroom. Maloney also went inside defendant's bedroom with the briefcase containing the cocaine. Defendant was in and out of his bedroom. Felix, for the most part, remained in the living room watching television. At some point, Maloney telephoned Hayes and told him that "the bottle of wine was ready." Some time later, defendant and Maloney were alone in defendant's bedroom. Defendant called Garcia into the room, and Garcia and Maloney ingested several "lines" of cocaine. Defendant may also have ingested some cocaine.

Hayes subsequently arrived at the apartment. At the time, defendant was upstairs in the kitchen. Garcia and Scheidenheim were also upstairs. Felix was watching television in the lower level living room. Hayes spoke with Maloney privately in defendant's bedroom, received some scrapings from the kilo of cocaine hidden in a pillowcase on the bed, and shortly departed. Hayes took the scrapings of cocaine to DCI agents, who immediately obtained a search warrant for defendant's apartment. By this time, Scheidenheim and Garcia had left the apartment.

At approximately 9 o'clock that evening, Hayes returned to defendant's apartment accompanied by police officers. Defendant opened the door, and the officers entered, discovered the kilo of cocaine in a washing machine located on the lower level of the apartment, and arrested defendant, Maloney, and Felix for violations of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1987, ch. 56½, par. 1101 *et seq.*). Subsequent laboratory analysis revealed that the substance recovered was in excess of 900 grams of cocaine.

Mark Bagnell, an investigator assigned to the DCI, interviewed defendant shortly after his arrest. After receiving his *Miranda* rights, defendant indicated that he wished to waive those rights and talk to Bagnell. Defendant related that he and Maloney had traveled to Florida for purposes related to "Brad's" business. They had returned to Bloomington with Enrique Felix. When questioned about the cocaine, defendant denied knowing anything about it or knowing that it had been present in his apartment. When Bagnell told defendant that he did not believe him, defendant requested an attorney and the interview ceased.

Defendant was returned to a holding cell, but later made a request to authorities to speak with Bagnell again. During this second interview, defendant gave a

detailed account of the trip to Florida with Maloney. Defendant indicated that he had been aware that the cocaine was in the car on the return trip to Illinois and later in the bedroom of his apartment. He related an understanding of the cocaine transaction between Maloney and Seaz, as well as the role that Felix played in the transport of the cocaine.

Felix was subsequently brought to trial in May 1989 on charges of possession of a controlled substance, controlled substance trafficking, and possession of a controlled substance with intent to deliver. At his trial, Felix testified that he had no knowledge of the cocaine in the car on the return trip from Florida or in defendant's apartment. The jury was unable to reach a verdict. Police authorities, however, conducted additional investigation into Felix's drug dealings in Florida. Witnesses who had Federal charges pending against them were prepared to testify against Felix should he be retried in Illinois. In addition, Federal authorities wished to interview Felix. Consequently, Felix's attorney proposed a plea agreement with the McLean County State's Attorney's office. An agreement was reached whereby Felix pleaded guilty to possession of cocaine with intent to deliver and received a 12-year sentence; and to perjury for which he received a 5-year concurrent sentence. In return, Felix agreed to testify "truthfully" on behalf of the State at the trials of Maloney and defendant.

## THE STATE'S WITNESSES

At trial, Felix testified that he first met Maloney at a nightclub in Fort Myers. He later saw Maloney at Eddie Seaz's house on January 2, 1989. Seaz told Felix that Maloney was a friend from Illinois who wanted to purchase a kilo of cocaine in order to raise money for a nightclub in Illinois. Maloney indicated that he needed to return to Illinois, had insufficient monies, and had al-

ready obtained a purchaser for the cocaine. He also indicated that he had a "business" partner, but mentioned no names.

After a few days, Seaz and Felix met with Maloney and defendant at a prearranged location where their auto was parked. Maloney put Felix's bag in the trunk and Felix got into the back seat of the car; defendant was seated in the front passenger seat. When Felix first entered the car, he asked defendant where the cocaine was located. Defendant told Felix that Seaz and Maloney had placed it in the trunk underneath the spare tire. Maloney, defendant and Felix then headed for Illinois. Maloney initially drove the automobile.

Felix related that defendant drove the car the following morning for about five hours. Felix recalled that while defendant was driving, defendant had asked Maloney how much money they would receive for the kilo and Maloney replied, "[T]wenty-five." Maloney also indicated to Felix that "they" wanted to make more money on the deal in order to obtain a liquor license for the club. According to Felix, during this conversation, defendant said that he did not know what he was going to do with "his half" of the money. Both defendant and Maloney said that they were each expecting to realize $5,000. Further, Felix said that at some later point during the trip, defendant expressed a desire to stop and ingest some of the cocaine because he was not used to the long drive and wanted to stay awake. Lastly, according to Felix, as they passed police officers near a traffic accident, defendant commented while looking at an officer, "[I]f you only knew what we had in the trunk."

When they arrived in Bloomington, Felix was under the impression that he would be taken to Maloney's residence and left there; and that defendant was going to be dropped off at his apartment. It was also Felix's understanding that he was not to be in the vicinity of the kilo

of cocaine, but that "they" would conduct business elsewhere. Felix believed that as soon as he was given the money from the deal, defendant and Maloney would arrange for his air flight back to Florida.

When the three men stopped at defendant's apartment building, defendant opened the door and allowed Felix to exit from the passenger side. Maloney was already at the trunk and handed defendant and Felix their luggage. Felix followed the defendant as he began walking towards his apartment building. Felix and defendant looked back towards the car and saw Maloney remove the kilo from the trunk and place it in his briefcase. Defendant then led the way into his apartment.

Once inside, defendant led Felix and Maloney into the lower level of the apartment. Defendant introduced Felix to three men who were present drinking beer and talking. Defendant and Maloney then went into defendant's bedroom and shut the door. Felix remained in the living room watching television with the other men. He smoked some marijuana with Garcia. After about 12 to 15 minutes, defendant and Maloney emerged from defendant's bedroom, "sniffing." Maloney then located the telephone and made several calls while walking back and forth between defendant's bedroom and the living room. Felix heard Maloney mention a "bottle of wine."

Felix testified that he also used the phone in defendant's bedroom to call Seaz. While Felix was in the bedroom, Maloney called defendant back into the room. Defendant entered the room and asked Felix whether he wanted to "do a line." Felix did. Maloney then produced the kilo from the briefcase and defendant held the kilo while Maloney scraped it. Maloney returned the kilo to the briefcase while defendant chopped it on a mirror and placed it into "lines." The three men then ingested the cocaine.

Defendant, Maloney and Felix re-entered the living room. Maloney made another telephone call. Defendant and Maloney then went back into defendant's bedroom and were alone for several minutes before defendant called Garcia into the room. After Garcia went into the bedroom, the door was closed.

Hayes arrived as defendant was going upstairs. Maloney introduced Hayes to Felix. Maloney and Hayes then went into defendant's bedroom, closed the door and remained for about seven or eight minutes. Garcia and another man were still present in the apartment, but shortly left for the evening. When Hayes came out of defendant's bedroom, he immediately left the apartment.

Maloney asked defendant whether he was also "going out." Defendant said, "No," he wanted to "stay with you guys." Maloney then pulled out a magazine with cocaine folded in it, spread it on the living room table, and he and defendant ingested two more "lines" of cocaine. Felix declined an offer to join them. After about 15 minutes, Hayes returned to the apartment with the police. Maloney tried to hand the kilo to Felix, who refused it. Maloney then tried unsuccessfully to hide the kilo in the washing machine.

Felix admitted that he had lied at his own trial. According to Felix, during his trial, two police officers had lied, so he lied to protect himself. Felix maintained, however, that he was telling the truth while testifying at defendant's trial. He understood that if he lied, he could be prosecuted again. Felix was also examined concerning the plea agreement he accepted. Before entering into the agreement, Felix had been interviewed. Prior to that interview, Felix had never told anyone that defendant said anything about cocaine or ingested cocaine. According to Felix, he had never previously related anything which incriminated defendant in order to remain consistent with his own defense.

Investigator Bagnell testified concerning the two interviews he had with defendant. Bagnell related the detailed account which defendant had given, and which essentially comported with the version of events provided by Felix. During cross-examination, when asked what defendant had said during the interview, Bagnell testified that defendant had requested an attorney. Defense counsel moved for a mistrial, but the motion was denied.

John Garcia, defendant's roommate and best friend, also testified. Garcia testified that when defendant, Maloney, and Felix arrived at the apartment, Felix remained in the living room, while defendant and Maloney went into defendant's bedroom and closed the door. At some point in the evening, defendant asked or motioned for Garcia to come into his bedroom. Defendant, Maloney and Garcia were the only persons in the bedroom. Garcia and Maloney ingested some of the cocaine. Garcia believed defendant did also, but he did not observe him do so. At the time, defendant was busy unpacking his clothes on the other side of the room. Garcia eventually left the apartment, as he was concerned about the presence of the kilo of cocaine.

Scott Scheidenheim, defendant's other roommate, who was also employed at the Traditionz nightclub, testified. Scheidenheim basically confirmed Garcia's testimony that Maloney and defendant had entered defendant's bedroom after their arrival with Felix; and that Garcia had been, at some point, in defendant's bedroom with defendant and Maloney while the door was closed.

## DEFENDANT'S TESTIMONY

Defendant testified that, at the outset of the return trip, he knew the details concerning the plan for the cocaine deal, including the agreed upon price and the anticipated delivery to Hayes. Defendant also admitted that Maloney told him that he had telephoned Hayes in

Bloomington relative to the transaction. Defendant, however, at first recalled no conversation during the return trip to Illinois concerning the cocaine, but then qualified that there could have been such conversation.

According to defendant, once the trio arrived in Bloomington, he was supposed to be dropped off at his apartment. When the auto stopped at his apartment, defendant exited, began walking towards his apartment, looked back, and saw Maloney and Felix grabbing their bags, coming to his apartment. According to defendant, he asked Maloney and Felix what they were doing, but they said nothing. Defendant did not see Maloney take the kilo from the car trunk, but assumed that it was in Maloney's briefcase. After the three men entered the apartment, with defendant admittedly leading the way, defendant told Maloney to leave, but Maloney said that he was "locked out" of his apartment and not to worry. When defendant entered his bedroom, Maloney followed, placing the cocaine on defendant's bed. While Maloney was in defendant's bedroom, he used the telephone. Defendant was in and out of the room. At some point, while he was in the bedroom alone with Maloney, defendant argued with Maloney, trying to get Maloney to leave the apartment. Defendant testified that he gave Maloney a credit card in order for Maloney to reserve a motel room elsewhere.

Defendant, however, admitted that he never attempted to speak privately with his roommates to tell them what was occurring. Nor did he attempt to convince Maloney to leave the apartment while in anyone's presence besides Maloney's. Defendant further admitted that, subsequent to his argument with Maloney, while he and Maloney were in his bedroom, Maloney had called to Garcia to come into the room and defendant had also gestured for Garcia to enter. Garcia and Maloney then ingested some "lines" of cocaine and laid out some

"lines" for defendant, but defendant did not ingest the cocaine. Defendant, however, testified that he had used cocaine with Maloney on two previous occasions. Defendant further testified that he wanted to leave the apartment with his roommates, but that Maloney wanted him to stay "because of" Felix. As an explanation for not exiting the car after the cocaine was initially placed in the trunk, defendant stated that he was very afraid of Felix. Defendant acknowledged, however, that, aside from small talk, he and Felix did not speak and Felix never made any type of threat.

Defendant was present in the upstairs level of the apartment when Hayes arrived. He knew that Hayes went downstairs. After Hayes left, defendant was aware from what Maloney told him that Hayes would return in one hour with the $35,000 to buy the cocaine. Defendant was also aware that a profit of at least $5,000 was going to be made from the deal and that the profit would benefit the nightclub. Defendant was also under the impression that Maloney had by then placed the kilo in defendant's top dresser drawer.

## INCONSISTENT VERDICTS

Defendant's major contention is that the jury returned legally inconsistent verdicts by acquitting him of possession with intent to deliver, but finding him guilty of controlled substance trafficking. In defendant's view, the verdicts are inconsistent because each offense requires proof of the same mental state, an essential element of the offenses. Legally inconsistent verdicts occur when the essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist even though the offenses arise out of the same set of facts. *People v. Frias* (1983), 99 Ill. 2d 193; *cf. People v. Hoffer* (1985), 106 Ill. 2d 186 (inconsistent

guilty verdicts on multiple counts with mutually exclusive mental states require reversal).

Section 401.1(a) of the Act, describing "Controlled substance trafficking," provides in pertinent part:

> "[A]ny person who *knowingly brings* or causes to be brought into this State *for the purpose of* manufacture or *delivery or with the intent to* manufacture or *deliver* a controlled or counterfeit substance is guilty of controlled substance trafficking." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.1(a).)

Section 401, unauthorized delivery, provides in pertinent part:

> "[I]t is unlawful for any person knowingly to *** deliver, or *possess with intent to *** deliver*, a controlled or counterfeit substance ***." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 56½, par. 1401.

Specifically, defendant contends that the mental state element, "with intent to deliver," found in section 401, unlawful delivery, is also found in section 401.1(a), controlled substance trafficking. According to defendant, he could not be found both to have the mental state necessary for the trafficking offense and not to have the mental state necessary for unlawful delivery.

Clearly, section 401.1(a) includes the element, "with the intent to *** deliver." Section 401.1(a), however, also includes as an element, "for the purpose of *** delivery." It is defendant's position that these two elements, linked by the word "or," are intended by the legislature to be synonymous, rather than alternative elements. Defendant then concludes that both elements necessarily require proof of a specific intent or "purpose" to deliver. Defendant argues that this interpretation of section 401.1(a) is supported because controlled substance trafficking is a more heavily penalized offense than the unlawful possessory offenses which require merely proof of the mental state of "knowledge."

As support for his interpretation of section 401.1(a), defendant directs our attention to the Model Penal Code which utilizes the word "purpose," instead of the word "intent," to describe the most culpable state of mind in a descending hierarchy of culpable mental states. (See *United States v. Bailey* (1979), 444 U.S. 394, 62 L. Ed. 2d 575, 100 S. Ct. 624 (discussing the American Law Institute's Model Penal Code which replaced the concept of general and specific intent with a hierarchy of culpable states of mind).) Defendant argues that Illinois adopted this hierarchical approach to mental state elements as is exemplified by section 4—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 4—4 (describing the mental state element of "intent")).

Section 4—4, "Intent," provides:

> "A person intends, or *acts* intentionally or *with intent, to accomplish a result* or engage in conduct described by the statute defining the offense, *when his conscious objective or purpose is to accomplish that result* or engage in that conduct." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 38, par. 4—4.)

According to defendant, section 4—4 indicates that the words "purpose" and "intent" were intended to denote equivalent states of mind.

" 'The cardinal rule of statutory construction, to which all other canons and rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature.' " (*People v. Boykin* (1983), 94 Ill. 2d 138, 141, quoting *People ex rel. Hanrahan v. White* (1972), 52 Ill. 2d 70, 73.) In determining the intent of the legislature, the court may properly consider not only the language of the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved. *American Country Insurance Co. v. Wilcoxon* (1989), 127 Ill. 2d 230, 239.

Defendant's view ignores the plain meaning of the statute, its legislative history and purpose, as well as similar enactments and similarly drafted statutory formulations. We first consider the statutory language. The pertinent elements of section 401.1(a) are: (1) knowingly bringing or causing to be brought into this State; (2) for the purpose of delivery; (3) or with the intent to deliver; (4) a controlled substance. Ill. Rev. Stat. 1987, ch. 56½, par. 1401.1(a).

Article 4 of the Criminal Code of 1961 describes mental states applicable to criminal offenses. (Ill. Rev. Stat. 1987, ch. 38, par. 4—1 *et seq.*) Section 4—3, "Mental State," provides in relevant part:

> "(b) [i]f the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each such element." (Ill. Rev. Stat. 1987, ch. 38, par. 4—3(b).)

Section 4—5, "Knowledge," provides in part:

> "A person knows, or *acts knowingly* \*\*\* *of*:
>
> (a) [t]he nature or attendant circumstances of his conduct, described by the statute defining the offense, *when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.*
>
> (b) *[t]he result of his conduct,* described by the statute defining the offense, *when he is consciously aware that such result is practically certain to be caused by his conduct.*" (Emphasis added.) Ill. Rev. Stat. 1987, ch. 38, pars. 4—5(a), (b).

We note that the term "purpose" is not included, and hence not described, as any one of the four possible culpable mental states recognized under the Criminal Code of 1961. (Ill. Rev. Stat. 1987, ch. 38, par. 4—1 *et seq.*) In interpreting legislative intent, the entire Criminal Code

and each of its sections must be considered. *People v. Hairston* (1970), 46 Ill. 2d 348, 356.

We note, too, that the ordinary meaning of "purpose" is broad and susceptible to various interpretations within the context of section 401.1(a). (See *Lake County Board of Review v. Property Tax Appeal Board* (1988), 119 Ill. 2d 419, 423 (a statutory term which is not defined must be given its ordinary and popularly understood meaning).) "Purpose" is defined as "an end or aim to be kept in view in any plan, measure, exertion, or operation" and "an object, effect or result aimed at, intended, or attained." (Webster's Third New International Dictionary 1847 (1986).) Thus, looking to the ordinary meaning of "purpose," a question, nevertheless, remains: Under section 401.1(a), must such an "aim or end" be that of the individual charged as opposed to that of others whose "purpose" the individual serves?

We interpret sections 4—3 and 4—5 to indicate that under section 401.1(a) "knowledge," traditionally a form of general intent, is the requisite mental state applicable to the provision as a whole. Thus, it is necessary to prove that an individual charged with a violation of section 401.1(a) have both knowledge of the "bringing" as well as knowledge of the end or aim of that activity. Section 4—3, however, recognizes that a distinction, with respect to mental state, may be made among the several statutory elements within a criminal provision. (See Ill. Ann. Stat., ch. 38, par. 4—3, Committee Comments, at 207 (Smith-Hurd 1987) (regarding section 4—3(b), that often a mental state word such as "knowingly" is positioned in a statute so that, grammatically, it may apply to all the elements of an offense).) In section 401.1(a), such a distinction denoting a separate mental state is indicated by the legislature's use of the word "intent," within the element "with intent to deliver." *Cf. People v. Lewis* (1980), 83 Ill. 2d 296, 305-06 (Moran, J., dissent-

ing) (unlawful delivery requires a voluntary act accompanied by merely knowledge, not intent, of delivery).

Parenthetically, we note that *People v. Lewis* concerned the interpretation of section 5(e) of the Cannabis Control Act (Ill. Rev. Stat. 1979, ch. 56½, par. 705(e)). In *Lewis*, this court found that it could be inferred from proof of delivery that the delivery was voluntary, or intentional. *Lewis* held that possession with intent to deliver is therefore an included offense of unlawful delivery. *Lewis'* rationale, however, is not helpful in our interpretation of section 401.1(a), because we are not concerned here with possible inferences which may arise from proof of "bringing," the element in section 401.1(a), which is arguably correlative to "delivery" in section 5(e).

Returning to the language of section 401.1(a), we do not believe that simply because the legislature used the word "purpose" in the phrase "for the purpose of \*\*\* delivery," this element therefore requires proof of a specific intent of the offender. The terms in a statute are not to be considered in a vacuum, but must be construed in the context of what they define. (*M.I.G. Investments, Inc. v. Environmental Protection Agency* (1988), 122 Ill. 2d 392, 400; see *People ex rel. Roan v. Wilson* (1950), 405 Ill. 122, 127-28 (in the case of ambiguity, it is proper to consider context to determine meaning).) In this case, the qualifying language modifying both "purpose" and "intent" is significant. (See Ill. Ann. Stat., ch. 38, par. 4—3, Committee Comments, at 198 (Smith-Hurd 1989) (recognizing that in addition to several uniform terms describing various mental states, "appropriate qualifying language" may be necessary to accurately describe a particular offense).) If the legislature intended that these elements be synonymous, it could have used the same qualifying language to modify each word, thereby indicating such a relationship. For example, the legislature

could have enacted the phrase, *"with* the purpose *to* \*\*\* deliver."

Furthermore, we believe that the word "or," as used in section 401.1(a) to link the two elements at issue, is more properly construed in the disjunctive, rather than the conjunctive sense. As used in its ordinary sense, the word "or" marks an alternative indicating the various members of the sentence which it connects are to be taken separately. See *People v. Vraniak* (1955), 5 Ill. 2d 384; see also *Campbell v. Prudential Insurance Co. of America* (1958), 15 Ill. 2d 308 (construction of the word "or" as a conjunctive rather than a disjunctive is permissible only when a literal reading is inconsistent with an apparent legislative intent).

Another rule of statutory construction followed by this court is that the presence of surplusage will not be presumed. (*People v. Wick* (1985), 107 Ill. 2d 62, 67.) Accepting defendant's view that "for the purpose \*\*\* of delivery" is synonymous with "with the intent to \*\*\* deliver" inappropriately presumes the presence of surplusage in section 401.1(a). However, because the legislature used both "purpose" and "intent," with differing modifying language, it appears that a distinction was intended between the two elements.

Even assuming that it is appropriate to literally apply section 4—4, describing "intent," to the phrase "for the purpose of," as defendant suggests, we would decline to do so. Our review convinces us that such an application would frustrate the spirit and the intent of the legislation. See *Gill v. Miller* (1983), 94 Ill. 2d 52, 59.

Thus, we appropriately turn to consider the purpose of the statute and the legislative history of section 401.1(a). "[O]ne of the primary purposes of the [Controlled Substances Act] is to 'penalize most heavily the illicit traffickers or profiteers of controlled substances.' " (*People v. McCarty* (1981), 86 Ill. 2d 247, 255, quoting

Ill. Rev. Stat. 1979, ch. 56½, par. 1100; see also *People v. Bradley* (1980), 79 Ill. 2d 410, 418.) The legislative history of section 401.1(a) shows that during the Senate debates, Senator Zito stated that the bill was initiated by the Cook County State's Attorney and was "designed really to attack the incidence of drugs brought in from foreign countries." (85th Ill. Gen. Assem., Senate Proceedings, May 22, 1987, at 155 (statement of Senator Zito).) During discussion in the House, Representative McNamara further stated:

> "This is a Bill that we worked out and ... which it gives a new problem in the ... or a new offense in the Law which is on trafficking of substance which is a greater offense than it was ... and there was no offense before \*\*\* [t]hat trafficking offense is one that would make a new offense for carrying it across the state line." 85th Ill. Gen. Assem., House Proceedings, June 26, 1987, at 371 (statement of Representative McNamara).

This review of the legislative history of section 401.1(a) reveals that the legislature intended for the ambit of section 401.1(a) to be broad. The debates indicate that the enactment was intended to snare not only those persons in the drug-trafficking network responsible for the actual delivery of controlled substances within the State, which is accomplished by section 401 (unlawful delivery), but also those operating at the outer reaches of the drug network who know they are bringing such substances into the State with an awareness that delivery will likely result from that conduct. Interpreting section 401.1(a) to require proof of a drug trafficker's intent to deliver would eviscerate the intended breadth of this enactment. Furthermore, if the legislature had intended that proof of intent to deliver be a necessary element to controlled substances trafficking, there would have been no reason to create an offense separate from unlawful delivery utilizing such expansive language as is found in

section 401.1(a). The apparent objective then of section 401.1(a), the penalization for the importation of controlled substances into the State, could simply have been accomplished by amending section 401, to include language prohibiting delivery into the State, and also heightening the penalties thereof.

A review of drug trafficking statutes in other jurisdictions further convinces us that such an offense need not necessarily require specific intent. (See *People v. Shorkey* (1974), 23 Ill. App. 3d 662 (even though other States' statutes are different, where the central purpose is the same, the interpretive reasoning of sister State courts may be considered).) Section 13A—12—231(1) of the Criminal Code of Alabama provides that: "[a]ny person who knowingly sells, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, *** 28 grams or more of cocaine *** is guilty of *** 'trafficking in cocaine.' " (Ala. Code §13A—12—231 (1990); see *Stewart v. State* (Ala. 1990), 580 So. 2d 27 (indictment under section 13A—12—231 requires allegation of a culpable mental state, "knowingly").) We note that cocaine "trafficking" statutes in Delaware, Florida, Georgia, Oklahoma, and the Virgin Islands are similarly patterned. (Del. Code Ann. tit. 16, §4753A (1990); Fla. Stat. §893.135 (Supp. 1991); Ga. Code Ann. §16—13—31 (1991); Okla. Stat. tit. 63, §2—415 (1990); V.I. Code Ann. tit. 19, §614a (Supp. 1991).) Such provisions require that a particular quantity of cocaine be "knowingly" brought into the State. These statutes presume that the drug is meant for delivery, rather than for personal use, by proof of its sizeable quantity.

Finally, we find it significant in terms of structural formulation that several unrelated Illinois criminal provisions require the mental state element of "knowledge," while also including the phrase "for the purpose of."

Section 406.1(a) of the Act prohibits the knowing grant of a building for use "for the purpose of *** delivering" a controlled substance. (Ill. Rev. Stat. 1987, ch. 56½, par. 1406.1(a).) Likewise, section 11—17(a)(1) of the Criminal Code proscribes "[k]nowingly *** permit[ting]" the use of a secluded or sheltered place "for the purpose of prostitution." (Ill. Rev. Stat. 1987, ch. 38, par. 11—17(a)(1).) In neither of these provisions does "for the purpose of" denote a specific intent element. The phrase instead serves to describe a "material fact," the awareness of which constitutes an essential element of the offense. See Ill. Rev. Stat. 1987, ch. 38, par. 4—5(a).

We conclude that section 401.1(a) does not necessarily require proof of an intent to deliver or manufacture. Such element is alternative to, rather than synonymous with, the element "for the purpose of *** delivery." Consequently, the jury could properly return verdicts finding defendant both guilty of controlled substance trafficking and not guilty of possession with the intent to deliver. The verdicts are not inconsistent.

## TRIAL ERRORS

Defendant also contends that significant trial errors occurred. First, relying upon *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, defendant argues that he was impeached by impermissible commentary upon his right to remain silent. Specifically, defendant argues that he was impeached because Investigator Bagnell commented upon defendant's request for an attorney.

*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, holds that the due process clause of the fourteenth amendment prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings. In *Doyle*, the prosecutor sought to improperly impeach a defendant's exculpatory story, told for the first time at

trial, by cross-examining him about his failure to have told the story after receiving *Miranda* warnings. Rather than provide any version of events related to the crime, both defendants in *Doyle* had maintained silence after receiving their rights. See also *People v. Nitz* (1991), 143 Ill. 2d 82; *People v. Szabo* (1983), 94 Ill. 2d 327.

In contrast, the defendant in *Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180, voluntarily spoke to authorities after receiving *Miranda* warnings and related a version which later proved to be inconsistent with his trial testimony. During cross-examination, the prosecutor brought out that the defendant had not previously told authorities the version he related at trial. The Supreme Court declined to apply *Doyle*, reasoning that cross-examination which merely inquires into prior inconsistent statements makes no unfair use of a defendant's silence, because a defendant who speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the Court found that the defendant had not remained silent at all. (*Anderson*, 447 U.S. at 408, 65 L. Ed. 2d at 226, 100 S. Ct. at 2182.) Even though each of the defendant's two inconsistent descriptions of events could be said to involve "silence," as it omitted facts included in the other version, the Court declined to interpret *Doyle* to require such a "formalistic" understanding of "silence." *Anderson*, 447 U.S. at 409, 65 L. Ed. 2d at 227, 100 S. Ct. at 2182.

Illinois also recognizes the *Anderson* qualification of *Doyle*. In *People v. Rehbein* (1978), 74 Ill. 2d 435, this court held that a prosecutor's cross-examination of a defendant concerning a prior inconsistent version of events was not an impermissible comment on the defendant's silence. Similarly, in *People v. Herrett* (1990), 137 Ill. 2d 195, 213-14, this court expressly recognized the *Anderson* qualification (State is not barred at trial from

cross-examining a defendant regarding prior inconsistent statements made at the time of his arrest). However, *Herrett* declined to apply the qualification because, unlike in *Anderson*, the defendant did not testify at trial, nor were his post-arrest statements inconsistent with the defense theory at trial. See also *People v. Adams* (1985), 109 Ill. 2d 102, 120 (cross-examination referring to defendant's failure to lead police to witness' house was not an impermissible comment on defendant's silence where trial testimony revealed that he had agreed to lead police there); *People v. Chriswell* (1985), 133 Ill. App. 3d 458.

Applying this analysis in the present case, we do not find that defendant's right to remain silent has been violated. During cross-examination of Investigator Bagnell, defense counsel asked, "[T]hat isn't all Todd Frieberg told you that night at all, is it?" Bagnell responded, "[H]e told me he wanted an attorney." Defense counsel moved for a mistrial on the basis of *Doyle*; however, the trial court denied the motion and the jury was admonished to disregard Bagnell's comment. According to defendant, the prosecutor attempted to rely on defendant's request for an attorney as proof of guilt because the prosecutor stated in closing argument:

> "And I submit that those admissions all prove him guilty beyond a reasonable doubt of each of these offenses because he told Officer Bagnell everything you need to find with regard to his intent and purpose of that trip."

We agree with defendant that a *Doyle* violation may result under circumstances where it is defense counsel who initiates inquiry into a defendant's post-arrest silence. (See *People v. Pegram* (1988), 124 Ill. 2d 166.) We can, however, discern no *Doyle* violation here, where defense counsel's open-ended examination inadvertently elicited the one brief statement that defendant requested an attorney; the jury was instructed to disregard the re-

mark; and the State did not comment upon that particular fact, but merely referred to defendant's admissions as a whole. (See *People v. Lindgren* (1982), 111 Ill. App. 3d 112, 117.) In sum, we do not believe that defendant was impeached by an improper focus upon the invocation of his rights. No error occurred, and even if we were to so find, such error was harmless beyond a reasonable doubt in view of the evidence presented here. See *People v. Beller* (1979), 74 Ill. 2d 514, 525.

Defendant makes the point that a second *Doyle* violation occurred because he was cross-examined regarding matters which he did not relate to Bagnell following his arrest. The record shows that when first interviewed by Bagnell, defendant related that: he knew nothing about the cocaine, but admitted that he had helped Maloney drive to and from Florida; that the purpose of the trip was to pick up some money in Florida in order to help Maloney's restaurant business; and defendant, Maloney, and Felix had gone to defendant's apartment after returning from Florida. Defendant also told Bagnell that he did not know why Hayes later appeared there, but he saw Hayes having discussions with Maloney. During direct examination, however, defendant testified to a markedly different version of the facts. He testified that he knew that the kilo of cocaine was in the trunk, and that he knew about the intended drug deal between Maloney and a potential buyer, as well as the role that Felix was expected to play in the deal. Defendant also testified that he told Bagnell "the truth" during the second interview, but that he had initially lied to Bagnell because he was "scared" of Felix and afraid of being charged with an offense.

During the cross-examination which followed, the prosecutor repeatedly queried defendant regarding the matters defendant admitted upon direct examination, but which he had not originally disclosed to Bagnell. In

the rebuttal portion of closing argument, the prosecutor commented to the effect that defendant's previous omissions indicated that his trial testimony was fabricated.

Under these circumstances, no *Doyle* violation occurred. Following his arrest and *Miranda* warnings, defendant did not remain silent. He related an entire version of events, but denied his knowledge of the cocaine and the anticipated drug deal. Defendant also omitted significant details to which he later testified at trial. This initial version was thus inconsistent with defendant's subsequent trial testimony and his theory of defense. Under *Anderson* and *Rehbein*, the State could properly cross-examine defendant regarding his prior inconsistent statements made following arrest.

In making this determination, we have considered two cases cited by defendant: *People v. Hooker* (1977), 54 Ill. App. 3d 53, and *People v. Robinson* (1976), 44 Ill. App. 3d 447. These cases, however, were decided before *Anderson* and *Rehbein*. Further, we find *People v. Gagliani* (1991), 210 Ill. App. 3d 617, also cited by defendant, to be distinguishable from the present case. *Gagliani* did not concern a situation where a defendant gave authorities any version of events which later proved inconsistent; the defendant simply denied knowledge of the incident. As such, the factual situation, as the appellate court recognized in *Gagliani*, was akin to that of *Doyle*. *Gagliani*, 210 Ill. App. 3d at 628.

The second alleged trial error defendant raises is that cross-examination of Felix was impermissibly limited by the trial court's ruling that Felix could not be questioned about the actual statutory sentencing terms for the three charges that he had originally faced. Relying on *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, and *People v. Triplett* (1985), 108 Ill. 2d 463, defendant argues that the limitation imposed on cross-examination of Felix prevented the exposure of Felix's

possible bias and motive to lie. Defendant argues that the limitation was especially harmful because witness credibility was a key element in the case.

The sixth amendment includes the right to cross-examine a witness as to the witness' biases, interests, or motives to testify. (*Davis*, 415 U.S. at 316-17, 39 L. Ed. 2d at 354, 94 S. Ct. at 1110; *Triplett*, 108 Ill. 2d at 474.) Although the circuit court has no discretionary power to deny the defendant this right, the circuit court does have broad discretion to preclude repetitive or unduly harassing questioning on these matters. (*Triplett*, 108 Ill. 2d at 475.) "Furthermore, when impeaching by showing bias, interest or motive, 'the evidence used must give rise to the inference that the witness has something to gain or lose by his testimony' and, therefore, the evidence used must not be remote or uncertain." (*Triplett*, 108 Ill. 2d at 475-76, quoting *People v. Phillips* (1981), 95 Ill. App. 3d 1013, 1020; see also *People v. Rainone* (1988), 176 Ill. App. 3d 35, 40; *People v. Sanders* (1986), 143 Ill. App. 3d 402, 407.) Any limitation of cross-examination is within the sound discretion of the trial court; a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in a manifest prejudice to defendant. *People v. Sandoval* (1990), 135 Ill. 2d 159, 194; see *People v. Rainone* (1988), 176 Ill. App. 3d 35, 40.

In the present case, it was revealed at trial that the plea agreement which had been offered to Felix misrepresented the actual statutory sentencing terms applicable to the charges Felix originally faced. When the agreement was made, both the State and Felix's defense counsel were under the impression that Felix faced a 15- to 60-year sentence on the controlled substance trafficking charge; 6 to 30 years' imprisonment on the possession with intent to deliver charge; and either 4 to 15 or 6 to 30 years' imprisonment on the possession charge. The actual statutory terms for these offenses were 30 to

120 years' imprisonment for controlled substances trafficking (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.1(b); ch. 38, par. 1005—8—1(3)); 15 to 60 years' imprisonment for possession with intent to deliver (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(3)); and 10 to 50 years' imprisonment for possession (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(4)). Thus, because of the mistake in the plea bargain agreement, Felix actually received the benefit of an 18-year reduction from his potential minimum sentence, rather than a 3-year reduction.

Defense counsel sought to cross-examine Felix about the actual benefit he realized from the plea bargain by bringing out the statutory minimums and maximums he had originally faced. The State opposed such cross-examination on the basis that its prejudicial effect outweighed its probative value. That is, the jury would be improperly inclined to weigh Felix's testimony on the basis of an 18-year, rather than a 3-year, beneficial differential. Defense counsel made an offer of proof to support the position by providing the testimony of Felix and his defense counsel. However, the testimony revealed that Felix was unaware, both at the time he entered the agreement and at trial, of the actual sentencing ranges he had originally faced. In addition, no evidence was presented that Felix could face resentencing, or that he believed he could. The trial court ruled that since Felix had no knowledge of the additional benefit he had gained by the sentencing mistake, that benefit could not have had impact upon his possible bias or motive to testify.

We find no abuse of discretion by this ruling. Cross-examination concerning evidence that Felix had received a benefit of which he had no knowledge would not have given rise to the inference that he had something to gain or lose. Even assuming error, we find that such error was harmless beyond a reasonable doubt. (See *People v. Wilkerson* (1981), 87 Ill. 2d 151, 157 (discussing three

tests for harmless error, including whether such error contributed to the result).) Any limitation upon use of such evidence under the circumstances here could not have contributed to defendant's conviction.

Defendant also argues that reversible error occurred when the trial court advised the jury to disregard testimony on the basis that it had not been disclosed, as ordered, before trial. The trial court's comment was prompted by Felix's testimony that defendant had been afraid that Felix was a drug enforcement agent. Defense counsel had objected to this testimony because the statement had not been disclosed before trial as requested.

According to defendant, by explaining to the jury that the testimony was to be disregarded because of nondisclosure, the trial court gave the impression that the testimony was to be kept out merely because of a legal technicality. While we agree that the trial court should not have provided the explanation (see *People v. Santucci* (1962), 24 Ill. 2d 93; *People v. Marino* (1953), 414 Ill. 445), the comment was brief and not remotely as egregious as the commentary in cases cited by defendant. Even were we to find error in the comment here (see *People v. Taylor* (1965), 32 Ill. 2d 165, 170 (trial court's comment that a delay in trial was caused by difficulty in removing defendant's handcuffs was not prejudicial), we fail to see how such a single, isolated and inadvertent remark could have prejudiced defendant here (see *People v. Wilkerson*, 87 Ill. 2d at 157).

## INSUFFICIENCY OF THE EVIDENCE

Defendant next contends that the evidence was insufficient to support a finding of guilt. It is the jury's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt. (*People v. Eyler* (1989), 133 Ill. 2d 173,

191.) "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *People v. Collins* (1985), 106 Ill. 2d 237, 261.) In addition, it is for the jury to weigh the credibility of the witnesses and to resolve conflicts or inconsistencies in their testimony. (*People v. Phillips* (1989), 127 Ill. 2d 499, 514.) With these principles in mind, we do not believe that a reversal of defendant's convictions is warranted.

To sustain a charge of controlled substance trafficking, the State was required to prove that defendant, with knowledge, brought into this State a controlled substance for the purpose of delivery or with the intent to deliver. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.1(a).) Defendant's own testimony established that defendant knew that a kilo of cocaine was in the trunk of the car when he, Maloney and Felix entered Illinois. That testimony also established that defendant knew that the cocaine was being transported into Illinois so that it could be sold to an interested buyer and that Maloney had already made such arrangements. Furthermore, defendant testified that he drove the car during part of the return trip from Florida. Additional evidence was presented that defendant expected to profit from the sale and that he willingly allowed the cocaine into his apartment. We believe that based upon this evidence, a rational trier of fact could have found defendant guilty of controlled substances trafficking beyond a reasonable doubt.

To sustain a charge of unlawful possession of a controlled substance, the State must prove knowledge of the possession of the substance, and that the narcotics were in the immediate and exclusive control of defendant.

(*People v. Embry* (1960), 20 Ill. 2d 331, 334; *People v. Bell* (1972), 53 Ill. 2d 122, 126; *People v. Smith* (1960), 20 Ill. 2d 345, 350-51.) Possession of drugs may be constructive. (See *People v. Mack* (1957), 12 Ill. 2d 151, 161-63.) Constructive possession exists without actual personal present dominion over a controlled substance, but with an intent and capability to maintain control and dominion. (*People v. Scott* (1987), 152 Ill. App. 3d 868, 871.) Where narcotics are found on premises under the defendant's control, it may be inferred that he had the requisite knowledge and possession, absent other facts and circumstances which might leave a reasonable doubt as to guilt in the minds of the jury. *People v. Nettles* (1961), 23 Ill. 2d 306, 308-09.

The uncontradicted evidence established that defendant knew that the kilo was present in the bedroom of his apartment. The uncontradicted evidence also established that: defendant was alone with Maloney in his bedroom with the door closed for at least some part of the evening; he and Maloney called Garcia into the bedroom and shut the door before the kilo was scraped and cocaine was ingested; the kilo was at some point on defendant's bed while he was present; and defendant was aware that it was placed, at one time, in his top dresser drawer.

Furthermore, despite defendant's protestations that he did not willingly allow the cocaine into the bedroom of his apartment, the uncontradicted evidence reveals that he did not discuss his concerns privately with his roommates, complain in their presence, or leave the apartment, despite his awareness that a drug transaction was to be consummated on the premises. On this score, defendant admits that it was he, in fact, who gestured for Garcia to enter the bedroom where Garcia partook of some cocaine. Such facts hardly support defendant's position that he did not willingly allow the cocaine onto his premises. The requirement that defendant's guilt be

proved beyond a reasonable doubt does not mean that inferences flowing from the evidence should be disregarded. *Nettles*, 23 Ill. 2d at 309.

Evidence was also presented that defendant held the kilo of cocaine as Maloney scraped it to make "lines"; and that defendant ingested some of the cocaine at least once while it was located in his bedroom. Further, testimony also indicated that defendant expected to profit from the anticipated drug transaction with Hayes. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could find defendant guilty of unlawful possession.

## IMPROPER JURY INSTRUCTION

Defendant raises an issue regarding jury instructions. He contends that the trial court erred by instructing the jury as to concepts of both accountability and constructive possession. The State's instruction on possession, Illinois Pattern Jury Instructions, Criminal, No. 4.16 (2d ed. 1981), stated:

"Possession may be actual or constructive. A person has actual possession when he has immediate and exclusive control over a thing. A person has constructive possession when he lacks actual possession of a thing but he has both the power and the intention to exercise control over a thing either directly or through another person.

If two or more persons share the immediate and exclusive control or share the intention and the power to exercise control over a thing, then each person has possession."

The State's instruction on accountability, Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981), stated:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly

solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

Although not clearly stated by defendant, he seems to contend that the accountability instruction is confusing when given in conjunction with a constructive possession instruction. However, he then broadly states that his guilt of "possession," if any, should have been established on the basis that he was a principal, rather than on a theory of accountability. Defendant represented to the appellate court that there are no cases upholding the concept of accountability for possession. We have, however, found otherwise.

If defendant is contending that concepts of accountability cannot be considered in conjunction with *actual* possession, his position is insupportable. In *People v. Edwards* (1984), 128 Ill. App. 3d 993, 999, the defendant arrived at a drug dealer's house with a satchel; later that evening, he accompanied the dealer to a meeting with a potential buyer, where the dealer referred to defendant as his partner, and then returned with the dealer to the dealer's house where a sale was to be transacted. The appellate court determined that even if the defendant had not been proven guilty of actual possession as a principal, he was proven so on the basis of accountability. See also *People v. O'Neal* (1985), 139 Ill. App. 3d 791, 796 (giving of accountability instruction, where unlawful possession charged, was proper).

If defendant's argument is, instead, that the presentation of both an accountability instruction and a *constructive* possession instruction was confusing, we find that there may exist some conceptual overlap of the principles. However, the concepts are not incompatible. Proof that one has aided, solicited, abetted, agreed or attempted to aid another in that person's constructive possession of illegal drugs may be demonstrated by certain

acts beyond mere presence. Furthermore, in the present case, the evidence supports a finding that defendant was guilty of constructive possession as a principal. Where a defendant may be found guilty of constructive possession as a principal, the giving of an accountability instruction is harmless error. (See *People v. Morrison* (1988), 178 Ill. App. 3d 76, 92 (defendant was found guilty as a principal of constructive possession of drugs found on his premises, so that any error in instructing the jury on accountability principles was harmless).) Thus, even were we to find error here in the giving of an accountability instruction, such error was harmless.

Accordingly, we affirm the judgment of the appellate court.

*Judgment affirmed.*

JUSTICE HEIPLE, concurring in part and dissenting in part:

In its essentials, the facts of this case are fairly straightforward. Defendant, Todd L. Frieberg, and a friend named Maloney drove a rented car to Florida from Bloomington, Illinois, supposedly to obtain money for a Bloomington nightclub that was experiencing financial difficulties. Maloney was the manager of the nightclub and defendant was an employee. Maloney told defendant that he was going to get a kilo of cocaine and take it back to Bloomington to sell it. After arriving back in Bloomington with the cocaine, they proceeded to defendant's apartment and Maloney contacted a prospective buyer. Unfortunately for defendant and Maloney, the buyer was an undercover agent. Defendant was arrested and charged with possession of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1402(a)(2)); possession with intent to deliver a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401); and controlled substance trafficking (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.1(a)).

Curiously, the jury convicted the defendant of possession of a controlled substance and also of controlled substance trafficking but acquitted him on the charge of possession with intent to deliver a controlled substance. Judgment was entered on the verdicts and the defendant was duly sentenced. He was fined $50,000 and sentenced to concurrent terms of 30 years' imprisonment for the trafficking offense and 15 years' imprisonment for the possession offense. The appellate court affirmed and the majority of this court likewise affirms. While I would affirm the conviction for possession of a controlled substance, I would reverse the conviction for controlled substance trafficking and remand the cause to the trial court for resentencing.

In relevant part, the controlled substance trafficking statute provides that any person who knowingly brings into Illinois a controlled substance with intent to deliver is guilty of controlled substance trafficking. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.1(a).) The jury convicted defendant of that charge.

Also, in relevant part, the possession with intent to deliver a controlled substance statute provides that a person who knowingly possesses a controlled substance with intent to deliver is guilty of the offense of possession with intent to deliver a controlled substance. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.) The jury acquitted the defendant of that charge.

Suffice it to say that the above two verdicts are flatly inconsistent. It is neither factually nor legally possible for the defendant in this case to be guilty of the one offense and not guilty of the other. If, as the jury found, he was not guilty of possession with intent to deliver a controlled substance, then he could not possibly be guilty of controlled substance trafficking. The significance of these inconsistent verdicts is that the conviction for trafficking must be reversed. That is so because both the

fifth amendment to our Federal Constitution (U.S. Const., amend. V) and section 10 of article I of our State Constitution (Ill. Const. 1970, art. I, §10) provide that a person shall not be twice put in jeopardy for the same offense.

The majority opinion devotes some seven pages to a logomachic discussion of the meaning and comparison of such words and concepts as mental state, purpose, for the purpose of, intent, intent to deliver, knowledge, knowingly, and even the word "or." It includes a discussion of legislative intent and history and compares statutes in other jurisdictions. Finally, it concludes that the verdicts are not inconsistent. The majority discussion reminds me of a eulogy once delivered in respect of a deceased professor of linguistics. The speaker remarked, "He was a learned professor. He could take a very simple matter and, in just a few moments time, make it completely incomprehensible." So far as I am concerned, a plain reading of the relevant statutes and their application to the facts of this case convinces me that the verdicts are inconsistent.

Accordingly, I respectfully dissent from that portion of the majority opinion which affirms the conviction of controlled substance trafficking. I would affirm the conviction for possession of a controlled substance and I would remand the cause to the trial court for resentencing.

JUSTICE BILANDIC joins in this partial concurrence and partial dissent.