# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Clark*, 2013 IL App (2d) 120034

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. GRADY T. CLARK, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-12-0034 |
| Filed | March 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court erred in ordering the disclosure of the name of the confidential informant who supplied the information that led to the prosecution of defendant for unlawful possession of a weapon by a felon, since defendant's argument for disclosure was based on speculation that his ex-girlfriend was the informant and was involved in a conspiracy to frame him, while the State's objection to disclosure was based on the public interest in preserving the anonymity of informants in order to encourage informants to provide information about crimes, an interest that was advanced by the reliable information the informant had provided in numerous prior cases. |
| Decision Under Review | Appeal from the Circuit Court of Stephenson County, No. 10-CF-155; the Hon. James M. Hauser, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

John H. Vogt, State's Attorney, of Freeport (Lawrence M. Bauer, Kristin M. Schwind, and Diane L. Campbell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Thomas A. Lilien and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellee.

Panel

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice Hutchinson concurred in the judgment and opinion.
Justice Birkett specially concurred, with opinion.

## OPINION

¶ 1    The State charged defendant, Grady T. Clark, with unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2010)), based on evidence that police found when they searched his home per a warrant. Defendant moved to require the State to disclose the identity of its confidential informant (CI), on whom the State had relied to obtain the warrant. The trial court granted the motion, but the State refused to comply. The court then dismissed the charge. The State appeals (see Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2006)). We reverse and remand.

¶ 2    On June 9, 2010, Aaron Hass, a Freeport police officer, and "Jane Doe," the CI, applied for a warrant to search a two-story, single-family house at 477 South Ottawa in Freeport for evidence that defendant, a convicted felon, possessed a weapon. In her affidavit, the CI stated as follows. Within the previous 72 hours, she had been inside the house. While there, she observed several firearms in a downstairs bedroom; two were black rifles, and two others were dark handguns. She observed defendant in possession of one of the firearms. Later, she spoke to Hass and described the weapons. In his affidavit, Hass stated as follows. He had spoken with the CI within the previous 72 hours. She told him that, within the preceding 72 hours, she had seen several firearms in the house at 477 South Ottawa. Outside the house, Hass confirmed with the CI that it was the one she meant and that defendant lived there. The CI had assisted the police department in past investigations. Her information had proven reliable and had resulted in several felony narcotics arrests.

¶ 3    On June 9, 2010, at 1:40 p.m., the warrant was issued. It was executed an hour later. On June 11, 2010, defendant was charged with unlawful possession of a weapon by a felon. On November 12, 2010, he moved to order the disclosure of the CI's identity. On December 3, 2010, the State filed a response, citing Illinois Supreme Court Rule 412(j)(ii) (eff. Mar. 1, 2001), which reads, as pertinent here, "Disclosure of an informant's identity shall not be required where his identity is a prosecution secret and a failure to disclose will not infringe

-2-

the constitutional rights of the accused." The State contended that defendant could not prove that disclosure was needed to ensure a fair trial.

¶ 4 On December 10, 2010, the trial court held an evidentiary hearing on defendant's motion. Hass testified as follows on direct examination by defendant. On the morning of June 9, 2010, the CI called him. She told him that defendant lived at 477 South Ottawa and that, within the last 72 hours, she had observed four firearms in the downstairs bedroom and had seen defendant possess one firearm at a specified time. Hass drafted the warrant application. He had not yet spoken with Sergeant Todd Barkalow about the case. Hass had known the CI for 4 to 5 years, had spoken with her about 50 times, and had received information from her more than 20 times. On June 9, 2010, he met her at the courthouse, where she signed the warrant application. She was paid $50. Hass never asked the CI whether she had placed any firearms at defendant's residence. He did ask her whether she had had any contact with any of the guns that day; she said no.

¶ 5 Asked whether he had any reason to believe that the CI's life or safety would be jeopardized by the disclosure of her identity, Hass testified that defendant had "a felonious background, including discharge of a firearm." Also, "there's always a danger to any confidential source for whatever information that they would get." The examination continued:

"Q. Okay. So with him in custody, and continuing to reside in the custody of the Sheriff, there would be no unique reason to this particular case to believe that the disclosure of the informant's identity would [endanger her] life or safety; is that true?

A. I don't believe it is, no.

* * *

Q. If he's in custody and–in the custody of the Sheriff, what would then be the plausible danger to the informant from disclosing the identity?

A. I don't even know who he all [*sic*] associates with, if it's other felons or not, dangerous felons. There's always that possibility. Any Defendant [*sic*] could have contact with someone outside the jail. They have telephones and visiting rights, so...

Q. Okay. So you don't know of anything–know of any known [*sic*] danger that would result–But you're surmising that, as in any case, it's possible that there could be some danger; is that right?

A. There's always that possibility, yes."

¶ 6 Hass testified that, on June 9, 2010, he did not ask the CI whether she had spoken to Barkalow earlier that day. She did not say anything implying that she had done so. Hass did not speak with Barkalow about this case until after the search. He arrived at the office at 8:30 a.m., so he did not attend the 5 a.m. briefing by the outgoing shift sergeant, Quincy Carter. At some point that day–Hass could not recall when–he heard someone say that an informant had told the Crime Stoppers hotline that firearms were going to be delivered to defendant's house. At the time, Hass knew that the police had investigated an alleged domestic battery there, but he had not been involved in the investigation. He had read the report; it had mentioned a black handgun.

¶ 7        Hass testified that he participated in the search. Defendant was found in an upstairs bedroom. In the bathroom, the police found a .40-caliber shell wrapped in a piece of a paper towel and a .40-caliber automatic pistol on a bathroom-sink vanity. Asked, "Other than the [CI], is there any other person that you have knowledge of, on the planet, who we know can tell us when those items were placed on the vanity in the home on Ottawa?," Hass testified, "I don't know anybody that could tell me when those items were placed on the vanity."

¶ 8        Hass testified on examination by the State as follows. The CI was not present or nearby during the search. Hass did not see her between when they left the courthouse and when the police searched defendant's house. The CI had told Hass that she had seen defendant in possession of one weapon. During the search, Hass found that weapon, a semiautomatic pistol. On reexamination by defendant, Hass agreed that, in his affidavit, he had stated that, outside of 477 South Ottawa, he "confirmed" with the CI that it was the right house. That confirmation occurred by cell phone, not in person, after Hass spoke with the CI but before they went to the court.

¶ 9        The hearing was continued to January 14, 2011. The trial judge told the parties that he had received confidential telephone records that defendant had subpoenaed, relating to calls that defendant's ex-girlfriend, Jennifer Adams, had made to the Freeport police. Defendant's attorney explained that he might need to examine the records, although defendant believed that Adams was probably not the CI. Defendant would want to know who called the Freeport police early in the morning of June 9, 2010, so as to explore his theory that the guns the police found later had been planted by the CI or by someone else in collusion with her. The judge delayed ruling on the matter.

¶ 10       Barkalow then testified as follows. On June 9, 2010, he started his shift at 5:45 a.m. and spoke with Carter. Carter said that an anonymous source had provided "information that there [were] possibly some guns and/or drugs to be delivered or some activity around" 477 South Ottawa. Carter's daily bulletin described the information as "crimestop [*sic*] drug info, 477 South Ottawa, Grady Clark, 3 a.m., several people standing outside." Just before the search, Barkalow spoke with Hass outside and relayed what Carter had told him.

¶ 11       Barkalow testified that he had not interacted with defendant in connection with defendant's arrest for the domestic battery of Adams, except for signing defendant's bond sheet on June 1, 2010. Barkalow knew Adams and her family "professionally" because he had been trying to locate her cousin, Ervin Allen, Jr., who was wanted for escape. For this reason only, Barkalow spoke with Adams several times by phone in the month before June 9, 2010. He did not talk to her or her family for any other reason; he never spoke to her about defendant. Barkalow did not talk to Adams on either June 8, 2010, or June 9, 2010. He did not know who the CI was. As best he could tell, he had had no contact with her.

¶ 12       Hass was recalled and testified as follows. Barkalow and Carter were both part of the team that executed the search warrant. Hass did not remember whether he spoke to Carter on the morning of June 9, 2010, but Carter never told him to investigate a Crime Stoppers tip relating to 477 South Ottawa. To Hass's knowledge, the CI had never served as a confidential source for Barkalow.

¶ 13       On May 17, 2011, at a short hearing, the State disclosed that Adams was *not* the CI. The

trial judge tendered to the parties, for copying and examination, the phone records that postdated May 23, 2010. At a hearing on August 12, 2011, defendant's attorney stated that he had examined the records; that he had not ascertained who owned some of the numbers that Adams had called; and that he had "some evidence" that, on June 9, 2010, after defendant was arrested, Adams placed one call to the Freeport police department and two calls to the jail. Further, the records showed

> "a flurry of phone activity involving Ms. Adams' phone in the wee hours of the morning on–between 1:00 and 2:30, and then again starting at 5:00 in the morning which corresponds to the–the time that Officer Barkalow's report indicates he was made aware of certain things when he came on duty ***. So there appears to be a need for some further investigation involving all this stuff; identifying the phone numbers that are not subject of [*sic*] identification and trying to ascertain whether or not these phone calls from Ms. Adams' phone at these important times of the day had something to do with the arrest of Mr. Clark. It has been our theory all along that–or at least mine, he's not ready to join me–that there's too much–that she's involved in this in someway."

¶ 14    Defendant's attorney requested leave to depose Adams so as to ascertain whom she had called, which in turn would enable the judge to "do an in-camera review of who the informant was and see if any of these people were involved. You know, she's calling the informant and they're then going in and claiming that they saw what she's telling them is going on." He explained that, if the judge learned the CI's identity and phone number, he could discern whether any of the unidentified numbers "relate[d]" to "this informant situation." Defendant's theory of the case was "based on the idea that the person who made this report is quite likely the person who planted the guns there." The judge declined to allow defendant to depose Adams but ordered the State to give the court the CI's identity and phone number and "whatever numbers would relate to the police officers."

¶ 15    By a letter of September 29, 2011, the judge informed the parties that he had examined Adams's phone records, checking for the cell phone numbers of the CI, Hass, and Barkalow. The CI's number did not appear in the records at all. Neither did Hass's number. Adams had called Barkalow's number three times: (1) on June 9, 2010, at 5:59:47 p.m., for 6 seconds; (2) on June 10, 2010, at 2:41:08 p.m., for 24 seconds; and (3) on June 10, 2010, at 2:41:57 p.m., for 57 seconds.

¶ 16    At the next hearing, on September 30, 2011, defendant requested a ruling on his motion to compel disclosure of the CI's identity. Defendant's attorney noted that the third call mentioned in the judge's letter had been to the police station, not to Barkalow's number. He then argued that the disclosure of the CI's identity was necessary to prepare his defense, because "all that contact" shortly before the arrest supported his theory that "this communication may have been related to setting up this particular arrest." Without the CI's name, the defense would be unable to establish "what, if any, relationship" the CI had to the person (Adams) who had contacted the police in the 48 hours leading up to defendant's arrest. Defendant's attorney continued:

> "[W]hat the defendant is alleging is a conspiracy to frame [him]. You know, if [the CI] and Officer Barkalow got together and said, 'Hey, you know, this can't–it would be

obvious if you're the confidential informant, we've got to use some third-party [*sic*],' and that's–ends up being somebody who we can prove [had] a relationship with her; that goes a long way toward proving our defense of the case."

Defendant also argued that, because the CI had claimed that she saw defendant possess a firearm that the police later found, she was a witness to the charged crime, as the two possessions were one continuing offense. The State responded that defendant's conspiracy theory was speculation and that no case law supported his continuing-offense theory.

¶ 17    At a hearing on November 4, 2011, the trial judge granted defendant's motion to compel the disclosure of the CI's identity. The judge noted that case law applying Rule 412(j)(ii) requires a trial court to balance the public interest in protecting informants and the flow of information against the right of the accused to prepare a defense. See *Roviaro v. United States*, 353 U.S. 53, 60-62 (1957); *People v. Woods*, 139 Ill. 2d 369, 378 (1990). In this case, the judge concluded, defendant's right predominated, as his defense was that "the gun found in his house was placed there by [the CI]" and there was no evidence that the CI's life or safety would be jeopardized by disclosing her identity. The court ordered the State to disclose the CI's identity within 14 days. On December 15, 2011, the court denied the State's motion to reconsider. At a hearing on January 6, 2012, the State informed the court that it would not disclose the CI's identity. Defendant moved to dismiss the charge. The State did not request an alternative sanction. The court dismissed the charge. The State timely appealed.

¶ 18    On appeal, the State contends that the trial court erred in ordering the disclosure of the CI's identity, because defendant did not meet his burden under Rule 412(j)(ii) to prove that disclosure was necessary to enable defendant to prepare his defense. According to the State, the CI provided the police with the probable cause needed to search defendant's home, but she was not involved in the offense itself, as either a participant or a witness. The State also contends that the trial court overlooked evidence that disclosure could endanger the CI.

¶ 19    Defendant responds that ordering disclosure was proper because he proved that he needed to know the CI's identity in order to prepare his defense, which was that the CI helped to frame him by planting the incriminating evidence in his home. Defendant also argues that, because the CI claimed to have witnessed defendant possessing a firearm that the police later found in the search, she was a witness to the offense, under defendant's continuing-offense theory. The State replies that defendant's conspiracy theory is too speculative and unsupported by actual evidence to satisfy his burden, so that the trial court erred in ordering disclosure. While we disagree with much of the State's reasoning, we do agree that defendant failed to establish a sufficient basis for the trial court to order the disclosure of the CI's identity. Therefore, we reverse the dismissal of the charge.

¶ 20    The parties disagree over our standard of review. Citing *People v. Rose*, 342 Ill. App. 3d 203, 205 (2003), the State contends that, because the facts are undisputed and the issues are purely legal, our review is *de novo*. Citing *People v. Chavez*, 327 Ill. App. 3d 18, 34 (2001), defendant counters that, because this appeal involves an order regulating discovery, we consider only whether the trial court abused its discretion. Although each opinion generally supports its proponent's position, neither necessarily controls here. For clarity, we defer our discussion of the issue until after we set out the basic authority applicable to the appeal.

¶ 21 Rule 412(j)(ii) codifies the common-law "informer's privilege" recognized by the Supreme Court in *Roviaro*. *Woods*, 139 Ill. 2d at 377-78. In *Roviaro*, the Court explained that the privilege advances the public's interest in effective law enforcement by preserving the anonymity of informers, thus encouraging them to communicate their knowledge of the commission of crimes to law enforcement officials. *Roviaro*, 353 U.S. at 59. However, the scope of the privilege is limited by fundamental fairness: "Where the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61. The Court continued:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62.

¶ 22 Significantly, the Court also stated, "Early decisions established that the scope of the privilege was in the discretion of the trial judge." *Id.* at 61 n.9. The lower federal courts and a fair number of foreign state courts have followed the implications of this language and held that, because striking the proper balance of the *Roviaro* factors is within the trial court's discretion, the grant or denial of a motion to disclose may be reversed only if the trial court abused its discretion. See, *e.g.*, *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997); *United States v. Johnson*, 677 F.3d 138, 143 (3d Cir. 2012); *United States v. Sanchez*, 988 F.2d 1384, 1391 (5th Cir. 1993); *United States v. Jenkins*, 4 F.3d 1338, 1341 (6th Cir. 1993); *United States v. Spires*, 3 F.3d 1234, 1238 (9th Cir. 1993); *United States v. Warren*, 42 F.3d 647, 654 (D.C. Cir. 1994); *Leonard v. State*, 492 S.E.2d 747, 751 (Ga. Ct. App. 1997); *State v. Farlow*, 163 P.3d 233, 236 (Idaho Ct. App. 2007); *State v. Clovis*, 807 P.2d 127, 137 (Kan. 1991); *State v. Dotson*, 256 So. 2d 594, 606 (La. 1971); *Drouin v. State*, 160 A.2d 85, 92-93 (Md. 1960); *People v. Thomas*, 436 N.W.2d 687, 689 (Mich. Ct. App. 1989) (*per curiam*); *Corry v. State*, 96-KA-01251-SCT (Miss. 1998); *State v. Wenzel*, 242 N.W.2d 120, 123 (Neb. 1976); *Commonwealth v. Roebuck*, 681 A.2d 1279, 1282 (Pa. 1996); *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *State v. Outlaw*, 321 N.W.2d 145, 154 (Wis. 1982). The rule applied in this line of cases does not appear to depend on whether the trial court needed to resolve any factual disputes (a matter obviously within its prerogative). Thus, the vast majority of foreign courts hold that, even when the facts are undisputed, the trial court's ruling on a motion to disclose a CI is subject to deferential review.

¶ 23 Illinois courts present a different story, in which the correct standard of review is not entirely clear. We begin by returning to the two opinions that the parties have cited. In *Rose*, the first of these cases, we held that review was *de novo*. *Rose*, 342 Ill. App. 3d at 205. However, we did not mention *Roviaro* or any other CI-disclosure case, either from Illinois or elsewhere. Instead, we cited solely to the *general* rule that, when the facts are not in dispute and the issues are purely legal, our review is *de novo*. *Id.* (citing *People v. Coleman*, 307 Ill. App. 3d 930, 934 (1999)). There is, of course, no doubt that this general proposition is the law in Illinois. "Where *** the question on appeal is limited to application of the law

to undisputed facts, the standard of review is *de novo*." *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005).

¶ 24 In *Chavez*, the second case relied upon by the parties, the court applied a standard of deferential review based not on *Roviaro* or any other CI-disclosure case from here or elsewhere, but on the uncontroversial rule that, in *general*, a trial court's decision "on a discovery violation" is reviewed only for an abuse of discretion. *Chavez*, 327 Ill. App. 3d at 32-33 (citing *People v. Matthews*, 299 Ill. App. 3d 914, 918 (1998)). *Chavez* did not consider whether deferring to the trial court's application of the law to given facts would violate the principle enunciated in *Torres*.

¶ 25 Thus, it is clear that there is some tension between *Rose* and *Chavez*. In addition, they apply general principles from other areas of the law without mentioning precedent specifically addressing the appellate review of CI-disclosure rulings. Other Illinois case law does not provide much more guidance. Some opinions, all at the appellate level, state or clearly imply that appellate review of a trial court's ruling on a motion to disclose a CI is limited to deciding whether the court abused its discretion. See, *e.g.*, *People v. Adams*, 259 Ill. App. 3d 995, 1008 (1993); *People v. Loggins*, 134 Ill. App. 3d 684, 690 (1985). However, these cases either lack any analysis of the issue or involve distinguishable facts.

¶ 26 The far more common approach in Illinois law is to address trial courts' rulings on CI-disclosure motions without stating explicitly whether their review is deferential or plenary. See, *e.g.*, *Woods*, 139 Ill. 2d at 377-82; *People v. Chaney*, 63 Ill. 2d 216, 225-27 (1976); *People v. Lewis*, 57 Ill. 2d 232, 234-35 (1974); *People v. Connie*, 34 Ill. 2d 353, 356-58 (1966); *People v. Nettles*, 34 Ill. 2d 52, 54-55 (1966); *People v. Mack*, 12 Ill. 2d 151, 164-66 (1957); *People v. Bufford*, 277 Ill. App. 3d 862, 867-68 (1995); *People v. Herron*, 218 Ill. App. 3d 561, 572-74 (1991); *People v. Velez*, 204 Ill. App. 3d 318, 325-27 (1990); *People v. Raess*, 146 Ill. App. 3d 384, 388-92 (1986); *People v. Coleman*, 124 Ill. App. 3d 597, 601-02 (1984); *People v. Martin*, 80 Ill. App. 3d 281, 292 (1979); *People v. Gomez*, 67 Ill. App. 3d 266, 269-70 (1978). Based on our review of these cases, we conclude that, in substance, all of them subjected the trial court judgments to *de novo* review. Each court set out the *Roviaro* factors, balanced them as *it* saw proper, and drew its own conclusions (sometimes stated as such), without ever implying that the trial court's conclusions were of the slightest importance to the outcome. Put simply, these courts applied the *Roviaro* test anew, without regard to the trial courts' reasoning–the very definition of *de novo* review. See *Cook County Board of Review v. Property Tax Appeal Board*, 339 Ill. App. 3d 529, 537 (2002); Black's Law Dictionary 467 (8th ed. 2004). Although these cases omit the phrase "*de novo* review," they appear to apply *de novo* review in fact.

¶ 27 Thus, the case law presents this court with a dilemma. On the one hand, *Roviaro* strongly suggests, if it does not actually hold, that appellate review of a trial court's ruling on a disclosure motion must be deferential, even if no pertinent facts are in dispute. On the other hand, the Illinois Supreme Court, by whose opinions we are bound (*People v. Artis*, 232 Ill. 2d 156, 164 (2009)), has never embraced the rule of deference and, indeed, has repeatedly repudiated it by implication. However, we need not resolve our procedural dilemma now, because, whether reviewed *de novo* or deferentially, the trial court's order is erroneous. Thus, like the farmer in Lincoln's story whose field was blocked by a tree trunk that could not be

dislodged by a plow, we confront our doctrinal obstacle by "plow[ing] around it." James A. Dueholm, *Lincoln's Suspension of the Writ of Habeas Corpus*: *An Historical and Constitutional Analysis*, 29 Journal of the Abraham Lincoln Ass'n, No. 2, Summer 2008, at 54.

¶ 28     Before explaining our holding, we dispose of two red herrings, one from each party. First, the State contends that the trial court erred by declining to conclude that disclosure would jeopardize the CI's safety. The State directs us to Hass's testimony that he saw that danger because defendant had a criminal record involving a firearm and because, even in jail, defendant might have some sort of contact with the outside. The State's treatment of the evidence is flagrantly selective. The testimony that we quoted at length earlier shows that, although Hass expressed the concerns to which the State alludes, he also conceded that he had no reason to conclude that the danger to the CI was greater than that presented in any CI-disclosure case. Moreover, the State ignores that, although the defendant has the burden to prove that disclosure is necessary, the State has the burden to prove that disclosure would endanger the CI. See *People v. Raess*, 146 Ill. App. 3d 384, 394 (1986). Applying either deferential or *de novo* review, we do not disagree with the trial court on this particular matter.

¶ 29     The other red herring comes from defendant. He contends that, because the CI claimed to have witnessed him possessing one of the guns that the police later found, she was a witness to the charged offense, even though the two alleged acts of possession were several days apart. Defendant reasons that the two acts were not separate offenses but parts of one continuing offense. As a result, he contends, because the CI was a witness, her identity should have been disclosed. Defendant relies on authority holding that one pertinent consideration under *Roviaro* is whether the CI arranged, witnessed, or participated in the offense. See *Woods*, 139 Ill. 2d at 378. Defendant cites a valid general principle of law, but he asks us to apply it to a context far removed from the logic of the rule.

¶ 30     The reason that disclosing a CI is more likely to be required when the CI had some connection to the charged offense is that the CI is thereby more likely to know matters that relate to the defendant's guilt or innocence–which, of course, is what the trial is all about. Thus, he is more likely to be a crucial witness. See *Rose*, 342 Ill. App. 3d at 206. Here, even were we to accept defendant's continuing-offense theory, it would make no difference. As the State notes, defendant was charged with unlawfully *possessing a weapon on the day that the police searched his house* and found the weapon(s). The State can convict defendant solely on what he did that day, without having to prove what he had done days earlier. The CI's testimony would shed no light on defendant's guilt or innocence, because she was not present during the search and could offer no crucial evidence on matters pertinent to whether defendant unlawfully possessed weapons then. Evidence that defendant possessed a gun several days before would be superfluous, if it could be admitted at all. (Ironically, it is normally *defendants* who try to keep out such other-crimes evidence.)

¶ 31     Defendant's continuing-offense theory does not make the CI a crucial witness to the offense as charged. It surely does not make her testimony more likely to be exculpatory. If the CI was telling the truth–*i.e.*, if defendant really did possess a gun several days before the police found the same gun in his home–that does not help defendant's defense. After all, he

is not really claiming that the CI witnessed the offense–he is claiming that there was no offense and that the CI fabricated evidence of the alleged crime. This distinguishes this case from those involving a CI who allegedly entrapped the defendant into committing an offense, such as selling drugs to undercover officers. In that type of case, the defendant ordinarily does not deny that he committed the offense but instead raises an affirmative defense, so that the CI might well be a crucial exculpatory witness.

¶ 32    If, on the other hand, the CI was lying and never did see defendant possess the gun, then bringing out that fact might be exculpatory–but only for one reason. That reason is that the CI lied because she was part of a scheme to frame defendant by planting evidence in his house and helping to engineer the search that turned up the planted evidence. But that is defendant's whole theory of the case anyway. Thus, the relevance of the CI's testimony ultimately has nothing to do with whether she was a "witness" to the alleged crime, and the continuing-offense theory has no independent significance. The real issue is whether defendant's theory overcame the informer's privilege. For the following reasons, we hold that it did not.

¶ 33    The defendant who moves to compel disclosure of a CI bears the burden of showing that disclosure is needed for him to prepare his defense. *Herron*, 218 Ill. App. 3d at 574; *Johnson*, 677 F.3d at 141. The ultimate issue, of course, is whether, considering all relevant circumstances, the defendant has demonstrated that his interest in preparing his defense outweighs the public interest in the free flow of information that can assist in the detection and prosecution of crimes. See *Roviaro*, 353 U.S. at 60-61; *Woods*, 139 Ill. 2d at 380. To meet his burden, the defendant must show that the defense theory that he relies on to obtain the CI's identity is founded on evidence, not speculation. *United States v. Skeens*, 449 F.2d 1066, 1070-71 (D.C. Cir. 1971). A mere theory is not sufficient; one based on evidence might be. This crucial distinction applies here.

¶ 34    Numerous courts have recognized that, *in principle*, a defendant might be entitled to the disclosure of a CI's identity on the basis that the CI "framed" the defendant, such as by planting incriminating evidence or by inducing the police, in some other way, to pursue the defendant as a suspect.[1] See *Rugendorf v. United States*, 376 U.S. 528, 536-39 (1964) (defendant convicted of knowingly receiving and concealing stolen furs in his home alleged that CI planted goods in his basement while he was away on vacation; Court majority held that theory was insufficiently grounded in evidence); *Coleman*, 124 Ill. App. 3d at 601-02 (in prosecution for unlawful possession of controlled substances and weapons that police found in defendant's car, appellate court held that defendant was entitled to disclosure

---

[1]The State contends that defendant's theory is not "recognized as one where the disclosure of the source is required." In view of the authority that we cite, including one opinion of the Supreme Court and one opinion from Illinois, this statement is just wrong. Moreover, it would not matter even if it were true; *Roviaro* and Rule 412(j)(ii) require only that the defendant prove that disclosure is needed to protect his right to prepare his defense. Even were there no cases recognizing that a well-founded frame-up theory might compel disclosure, nothing would rule out that possibility. A defendant must establish that he needs disclosure in order to receive a fair trial. He need not prove that his theory is one that opinions granting relief have actually endorsed.

because evidence raised reasonable possibility that CI witnessed somebody plant items); *Thornton v. State*, 231 S.E.2d 729, 732-34 (Ga. 1977) (*per curiam*) (evidentiary hearing in trial court was required, as defendant alleged that another person committed the crime and that CI was part of conspiracy to frame him); *Dotson*, 256 So. 2d at 608 (recognizing that defendant's allegation that CI helped to frame him by placing marijuana into his coat was possible ground for ordering disclosure of CI, but holding that trial court had properly concluded that defendant had insufficiently supported theory); *Jenkins v. State*, 97-KA-00991-COA (¶¶ 9-21) (Miss. 1999) (recognizing that argument that CI had planted illegal drugs in defendant's home was possible reason to compel disclosure, but holding that trial court did not abuse its discretion in concluding that theory was too speculative).

¶ 35    We hold that defendant failed to establish a sufficient factual record on which to compel the trial court to disclose the CI's identity. As noted, the public interest in the free flow of information requires that, to obtain the CI's identity, a defendant support his claim of need with more than speculation. As one court has written:

> "If the informer's relation to the acts leading directly to or constituting the crime may be assumed from a fertile imagination of counsel, the Government in practically every case would have to prove affirmatively that the informant had not done any such likely acts. Having done that, all would be revealed and the informer privilege, deemed essential for the public interest, for all practical purposes would be no more." *Miller v. United States*, 273 F.2d 279, 281 (5th Cir. 1959).

Accord *Jenkins*, 97-KA-00991-COA (¶ 16) ("If in every possession case in which a confidential informant was involved, the defendant merely by alleging that the drugs were planted could require the disclosure of the informant's name, the important privilege for informants would be destroyed.").

¶ 36    All that remains for us now is to apply the foregoing. Here, defendant's conspiracy defense underwent some evolution. At first, apparently, he theorized that Adams, his ex-girlfriend, was the CI and that she had planted weapons in his home out of some malicious motive. Later, however, defendant abandoned any assertion that Adams was the CI (which she was not) but posited that Adams conspired with both the CI and the police. Defendant's attorney explained that his theory was that, with Adams's collaboration, and apparently at her behest, the CI planted the weapons in defendant's home, reported the presence of weapons to the police, and induced the police to search the home and find the evidence. Apparently, according to this theory, Barkalow was in on the plan (exactly how is not altogether clear to us), so that Adams's calls shortly before the search were needed to fulfill her and the CI's desire to frame defendant. On appeal, defendant contends that the three calls that Adams made shortly before the search provide a basis to compel the disclosure of the CI's identity, because, knowing who the CI was, defendant could "establish the relationship between Jennifer Adams and the [CI]."

¶ 37    This theory is deficient in at least two respects. First, it is vague, even after numerous iterations. The motivation for the CI to aid Adams is not given, and the relationship of Barkalow to the other two alleged conspirators, and his motivation, are not developed either. Barkalow did not obtain the search warrant; Hass did. Defendant's theory says little about

Hass and does not focus on him as a possible conspirator. Exactly how the alleged conspiracy functioned is less than clear from defendant's own explanations of his theory. This lack of clarity might result from the second and more crucial defect in defendant's theory: the lack of significant evidence to support it.

¶ 38    Defendant's theory posits a triangular and mutually reinforcing set of relationships among Adams, the CI, and the police (or at least Barkalow). The trouble is that no leg of this triangle is more than a very blurry line, at best. Defendant focuses on the telephone records, which allegedly show a suspicious "flurry" of activity between Adams and Barkalow shortly before the search. However, the telephone records are far more significant for what they do not show. First, for weeks before the consummation of the alleged conspiracy, there were *no* calls between Adams and the CI. Second, there were *no* calls between Adams and Hass, the officer who actually spoke to the CI, obtained information from her, and applied for the search warrant.

¶ 39    Finally, what defendant characterizes as a "flurry" of telephone calls was apparently no more than a light dusting–and one that was ambiguous at best. Defendant was reduced to relying on three calls from Adams, lasting, respectively, 6 seconds, 24 seconds, and 57 seconds. Defendant did not establish a reasonable probability that Adams made the calls to Barkalow or even that the calls were answered; Barkalow testified that he did not speak to Adams in the period covered by the calls, and he also testified that he had known Adams solely because they were both concerned about locating Adams's cousin in an unrelated matter. The witnesses provided no evidence that the calls were made for the purpose defendant posited. The theory that these calls were part of a plan to frame defendant receives no support from the evidence; there is simply nothing implying any such framers' intent.

¶ 40    Worse for defendant, the three telephone calls were probably the *strongest* evidence in favor of his theory. There was no evidence of any preexisting relationship between Adams and the CI, or of any preexisting relationship between the CI and Barkalow. Indeed, Barkalow testified that he did not know who the CI was and, as far as he could say, had never met her. While there was of course evidence that the CI had significant contacts with Hass, the State offered an innocent explanation–she was an experienced informant whom the police had used with great success. Asked whether he knew of anyone other than the CI who could say when the pistol and shell were placed on the vanity in defendant's bathroom, Hass testified that he did not know of *anyone* who could so say. "Anyone" included the CI. Barkalow denied ever having interacted with defendant before, except for signing a bond sheet on June 1, 2010, in the domestic battery case. In sum, defendant's conspiracy theory did not advance beyond speculation, and his need to identify the CI in order to pursue the theory was equally speculative.

¶ 41    Against the foregoing, the State could point to the recognized public interest in the free flow of information as good reason to deny defendant's motion. The strength of this interest went beyond that inherent in any CI-disclosure situation. Hass testified that the CI had provided the police with reliable information on numerous prior occasions and that her assistance had resulted in several successful prosecutions. In sum, under any standard of review, we must conclude that the trial court erred in granting defendant's motion to disclose.

¶ 42       The judgment of the circuit court of Stephenson County is reversed, and the cause is remanded.

¶ 43       Reversed and remanded.

¶ 44       JUSTICE BIRKETT, specially concurring.

¶ 45       I concur with the result reached by the majority. I write separately because in my opinion the dissertation on the standard of review is confusing and unnecessary. The majority states based on its review of Illinois cases that "in substance, all of them subjected the trial court judgments to *de novo* review." *Supra* ¶ 26. On the contrary, I believe it is settled law in Illinois that an appellate court reviews a trial court's pretrial ruling on whether to compel the disclosure of an informant's identity under an abuse-of-discretion standard. See *People v. Peatry*, 38 Ill. App. 3d 332, 337 (1976); *People v. Loggins*, 134 Ill. App. 3d 684, 690 (1985); *People v. Ofoma*, 242 Ill. App. 3d 697, 704 (1993). Federal courts have held likewise. *United States v. Johnson*, 886 F.2d 1120, 1122 (9th Cir. 1989); *United States v. Harrington*, 951 F.2d 876, 877 (8th Cir. 1991); *United States v. Moore*, 954 F.2d 379, 381 (1992). Generally, rulings on discovery motions, as well as evidentiary rulings, such as on motions *in limine*, are directed to the trial court's discretion. See *People v. Harvey*, 211 Ill. 2d 368, 393 (2004). The trial court's order of dismissal in this case was a discovery sanction, which is generally reviewed under the abuse-of-discretion standard. *People v. Newberry*, 166 Ill. 2d 310, 318 (1995) (evidence destroyed after defense counsel's request to preserve); *People v. Pearson*, 210 Ill. App. 3d 1079, 1083 (1991) (involving an informant known to the defendant, but the State refused to provide information regarding benefits to the informant).

¶ 46       An exception to this standard exists when the question is purely one of law, which was the case in *People v. Rose*, 342 Ill. App. 3d 203 (2003). In *Rose*, this court found that the trial court improperly dismissed the indictment as a discovery sanction where the trial court ordered disclosure of a confidential informant without first requiring the defendant to meet his burden to show that disclosure was necessary to his defense. This was an issue of law and review was properly *de novo*. See *People v. Hood*, 213 Ill. 2d 244, 256 (2004) (where facts giving rise to an alleged discovery violation are not in dispute, the issue becomes one of law that is reviewed *de novo*).

¶ 47       The majority recognizes "some tension between *Rose* and *Chavez*." See *supra* ¶ 25. I see no such tension. In *Chavez*, the defendant made an attempt to show materiality and relevance of disclosure of the confidential informant to his defense. He argued that the " 'informant could testify to the nature and extent of the conversations he had with Mr. Chavez.' " *Chavez*, 327 Ill. App. 3d at 35. In *Chavez*, there were two motions for disclosure. Before ruling on the second motion the trial court ordered production of the informant's file to "determine the extent of the informant's activity in [the] case." *Id.* The record did not reveal whether the trial court conducted an *in camera* inspection. The court noted that based upon the record the informant appeared to be a mere tipster. *Id.* The appellate court concluded that without evidence to the contrary it could not conclude "that the circuit court abused its discretion in balancing the strong public policy reasons favoring concealment of an

-13-

informant's identity against the defendant's need for disclosure in order to prepare his defense." *Id.* (citing *People v. Matthews*, 299 Ill. App. 3d 914, 918 (1998) (alleged discovery violation for failure to disclose a statement)).

¶ 48    The majority does not discuss the distinction between requests for disclosure to determine the existence of probable cause and requests for disclosure to prepare a defense at the trial. In *People v. Vauzanges*, 158 Ill. 2d 509, 520 (1994), this court explained:

"We note that the trial court is motivated by different concerns in exercising its discretion with respect to production of an informant as opposed to disclosure of an informant's identity. When considering whether to order the production of the informant and/or the police file for an *in camera* examination or inspection, the trial court is concerned with the existence of the informant and with maintaining the integrity of the judicial process. Conversely, when determining whether to disclose the identity of the informant, the trial court is concerned with a defendant's need for disclosure in order to prepare his defense. Therefore, production of an informant for an *in camera* examination should not be confused with disclosure of an informant's identity, since different concerns are at stake."

¶ 49    To me it is clear that in both settings the trial court is exercising its discretion but applying different standards. In *Vauzanges*, the record was unclear as to whether there had been an *in camera* inspection of the informant's file during a *Franks* hearing. See *Franks v. Delaware*, 438 U.S. 154 (1978). The court said that under these particular circumstances "the trial court may have abused its discretion if it found Officer Ptacek credible regarding the existence of the informant without first inspecting the police files on the informant." *Vauzanges*, 158 Ill. 2d at 521.

¶ 50    The majority does a commendable job in its discussion of defendant's deficient showing of need. There was no evidence presented, by affidavit or otherwise, that demonstrated a need for disclosure. Defendant's motion for disclosure is boilerplate and simply alleges that disclosure "is necessary to investigate the defendant's defense herein." Such a bare-bones motion barely gets the ball rolling when such important interests are at stake. See *United States v. Moore*, 954 F.2d 379 (6th Cir. 1992).

¶ 51    Finally, the majority takes issue with the State's argument that the "trial court erred by declining to conclude that disclosure would jeopardize the CI's safety." See *supra* ¶ 28. First, the State was not required to show that disclosure would jeopardize the CI's safety, because defendant failed to demonstrate a need for disclosure. *Rose*, 342 Ill. App. 3d at 206-07.[2] The danger to informants is inherent in the role they play in uncovering and solving crimes. As the Illinois Supreme Court has stated, "the personal safety of an informer is one of the public purposes for preserving anonymity." *People v. Mack*, 12 Ill. 2d 151, 167 (1957). The fate that sometimes befalls informers was common knowledge in 1957. This observation is equally

---

[2]After remand, Rose provided further details of how disclosure would aid his entrapment defense. After an *in camera* inspection of the informant's file, the trial court granted use of "the informant's name solely in the preparation of his case." *People v. Rose*, 384 Ill. App. 3d 937, 938 (2008).

true today. A defendant's criminal history, especially past arrests or convictions for crimes of violence or weapons offenses, is particularly relevant to a trial court's balancing of the interests, even absent evidence of a specific threat to harm the CI. The discussion of this issue is unnecessary because defendant failed to show a need for disclosure, which is required before the trial court is required to balance the defendant's interests against the State's interests.

¶ 52　　　As my colleagues note, there are no contested facts and defendant failed to articulate how disclosure of the informant's identity would have advanced his theory of defense–that the firearm and ammunition were planted. Unlike with some CI warrants, defendant was in possession of the informant's sworn affidavit in support of the search warrant. In these circumstances, defendant's request for disclosure amounts to nothing more than a mere desire to cross-examine, which is insufficient as a matter of law to show need. In this case, then, our review is *de novo*.